```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                         MIAMI DIVISION
 3
                  CASE NO:  23-cv-24073-CMA
 4

 5

 6

 7 HH ADVERTISING, INC.,          )
                                  )
 8         Plaintiff,             )        November 20, 2024
   v.                             )
 9                                )
   UNIQUE VACATIONS, INC. et al.,)
10                                )        Pages 1 - 58
           Defendants.           )
11 _____/

12

13

14
                      DISCOVERY HEARING
15
            BEFORE THE HONORABLE LISETTE M. REID
16             UNITED STATES MAGISTRATE JUDGE

17
       Michael K. Johnson, Blake M. Carey, Ian M. Betts, and
18

19 APPEARANCES:

20
   On behalf of the Plaintiff:
21
               KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.
22             201 South Biscayne Boulevard
               Twenty Seventh Floor
23             Miami, FL 33131
               BY:  TERRI E.T. MEYERS, ESQ.
24             BY:  GABRIELLE CRAFT, ESQ.

25
```

```
 1   APPEARANCES CONTINUED:

 2   On behalf of the Defendants:

 3                 LATHAM & WATKINS LLP
                   555 Eleventh Street, NW
 4                 Suite 1000,
                   Washington, DC 20004
 5                 BY:  MATTHEW WALCH, ESQ.
                   BY:  DAYRON SILVERIO, ESQ.
 6                 BY:  JESSICA SABA, ESQ.
                   BY:  SARA CASTIGLIA, ESQ.
 7


 8
                   NORVELL IP LLC
 9                 PO Box 2461
                   Chicago, IL 60690
10                 BY:  JOSEPH V. NORVELL, ESQ.
                   BY:  MICHAEL K. JOHNSON, ESQ.
11                 BY:  IAN M. BETTS, ESQ.

12


13                 BRITO PLLC
                   2121 Ponce de Leon Boulevard
14                 Suite 650,
                   Coral Gables, FL 33134
15                 BY:  ALEJANDRO BRITO, ESQ.

16


17
     Transcribed by:
18
                   BONNIE JOY LEWIS, R.P.R.
19                 7001 SW 13 Street
                   Pembroke Pines, FL  33023
20                 954-985-8875
                   caselawrptg@gmail.com
21

22

23

24

25
```

```
 1              (Thereupon, the court proceeding was held and the
 2    audiotape commenced as follows:)
 3              MR.  BRITO:  Alejandro Brito with Brito PLLC.
 4              THE COURT:  Okay.  I will never keep up with all of
 5    that.
 6              Okay.  So, Mr. Norvell, you are with unique Vacations
 7    and Unique Travel Corporation?
 8              MR. NORVELL:  That is correct.
 9              THE COURT:  Okay.  Very good.
10              All right.  But what we are hearing today is Mr.
11    Silverio's concerns first about an attorney being -- an
12    attorney for the Defendants -- being deposed or a former
13    attorney.
14              Is that what I understand, Mr. Silverio?
15              MR. SILVERIO:  That is correct, Your Honor.
16              And the argument is going to be handled by Matthew
17    Walch, but just we --
18              THE COURT:  Okay.
19              MR. SILVERIO:  The emergency matter that was noticed
20    to Your Honor, via e-mail, it does concern the former attorney.
21              There are also two other matters that were noticed to
22    Your Honor in our original e-mail that was originally set for
23    November 4th and those are matters that concerning Mr. Norvell
24    and UVI and UTC.
25              MR. NORVELL:  And Your Honor, there is also one more
```

4

1   matter, another matter, and we did send an e-mail to the Court

2   on this for a deposition to occur tomorrow.

3       THE COURT:  Okay.  So where should we start?

4       The deposition of the attorney, is that the one that

5   is tomorrow or no?

6       MR. SILVERIO:  That is scheduled for Friday, Your

7   Honor.

8       THE COURT:  Okay.  So we have a lot happening.

9       So let's start with the attorney who is scheduled or

10   the person who is to be scheduled for tomorrow.  Let's start

11   with that.

12       MR. SILVERIO:  Okay.  Your Honor, that would be very

13   quick.  That would be Andrew Blanco and he is the CEO of our

14   client Unique Vacations, Inc.  He is also a board member for

15   Unique Travel Corporation, who is also our client and a second

16   Defendant in this case.

17       THE COURT:  Yes.

18       MR. SILVERIO:  And the Plaintiffs in this case noticed

19   up two 30(b)(6) depositions for tomorrow.

20       One we will call them UVI, Unique Vacations, and the

21   other one who we will call UTC, Unique Travel Corp.  Both

22   30(b)(6) depositions.

23       And we said we would produce Andy as the corporate

24   representative for both of those.  And we've said that that

25   deposition would take place tomorrow.  It would cover both

1  those 30(b)(6)s.  And then, also his individual deposition,

2  which the date they have originally noticed has come and

3  passed.

4        Yesterday Plaintiffs issued a new notice, an amended

5  notice, a 30(b)(6) for UTC for his deposition to occur on

6  December 2nd.

7        So we think for purposes of efficiency, convenience,

8  and to be less burdensome that these depositions, each 30(b)(6)

9  covers the exact same topics.  It should occur on the same day.

10  It is the same deponent.  The same issues and that it should

11  all occur tomorrow.

12        And if it does not occur tomorrow, Mr. Blanco is not

13  available on December 2nd, but we need to find a date that

14  works for him.  And we can provide some dates so that we can

15  handle all three of these depositions at the same time for

16  efficiency purposes.

17        THE COURT:  Okay.  So that seems reasonable.

18        So what is the objection to that?  Why can't they have

19  that?

20        MS. MEYERS:  Well, I don't think this has been

21  thoroughly -- the conferral has been completed.  I got an

22  e-mail prior to the deposition, but I am happy to discuss it

23  anyway.

24        This case, just by way of background, we are on a very

25  compacted schedule.  We are trying to fit in these depositions

1   all within -- the discovery cutoff has already passed.  It was

2   October 28th.  By agreement the parties extended it to November

3   28th.

4          And then, the parties jointly filed a motion with the

5   Court extending the period even longer because there was a

6   December 19th pretrial stip date and we wanted to continue to

7   be able to take depositions beyond the December date, you know.

8   So now we basically are taking depositions into December.

9          The issue that arose very recently was that the

10  Defendants filed a motion for summary judgment and that was

11  unexpected and they are certainly within their right.

12         But in order to counter the motion for summary

13  judgment, we obviously need evidence of deposition testimony.

14  And it would be a shame to cut it short to have a full record

15  that we can use.  And the parties have worked cooperatively

16  together.

17         And I think there are a lot of depositions that still

18  remain to be scheduled.  We are moving things around.  And I

19  think so far have been working pretty effectively.  The one

20  issue that has come up, however, with respect to the Unique

21  depositions that are scheduled for tomorrow is that the

22  production is not complete.

23         And we received the first production from Unique, I

24  believe, on Friday; this past Friday.  It has, I believe, nine

25  thousand and change documents.  We have not been able to review

1    those documents yet.

2          So what we thought was a good idea and we discussed

3    this yesterday was to take the UVI deposition.  Instead of

4    taking both depositions on the same day, I imagine the bulk of

5    the deposition will be completed tomorrow.

6          But to the extent there are documents that we have not

7    even reviewed and we would like to review in advance of the UTC

8    deposition, we would notice it on a different day, which is

9    what we did.  We probably will notice another deposition on

10   that day because it probably won't be very long and we are

11   having to do that with several depositions in this case.

12         But it was really only for purposes of not having been

13   able to review the documents and their document production is

14   not yet complete.  They were supposed to complete it by

15   yesterday and we did not receive another production yesterday.

16         So I think everybody is working as quickly as they

17   can, but I don't see that there is any prejudice to the

18   Defendants by setting that second deposition.  It is a party

19   just like UTC and UVI are both parties.  We are entitled to

20   take separate depositions for them.

21         To the extent that we can be efficient and ask

22   most of the questions tomorrow we will, but we certainly want

23   to preserve our right to ask some questions regarding documents

24   that we have not yet seen yet once we review them.

25         THE COURT:  But you are not asking to duplicate the

 1  depositions all over again?

 2          MS. MEYERS:  No.

 3          THE COURT:  You are saying new things that arise in

 4  these documents that you have not yet reviewed --

 5          MS. MEYERS:  Correct.

 6          THE COURT:  -- without having the ability to bring

 7  them up.  What about the individual depositions, though?

 8          MS. MEYERS:  We have no intention of taking an

 9  additional deposition of Mr. Blanco.

10          THE COURT:  Okay.

11          MS. MEYERS:  We have not noticed it.  We haven't set

12  it.  I am not sure where that misunderstanding came from.

13          THE COURT:  Okay.

14          MR. SILVERIO:  Your Honor, if you don't mind, I will

15  would like to address a couple of those points?

16          First, Rule 56 provides for if someone files a summary

17  judgment motion a mechanism for seeking to obtain discovery

18  before responding.  And the Plaintiffs have not filed a Rule 56

19  motion.

20          In fact, they are trying to circumvent that now by

21  squeezing in this deposition in order to have a deposition that

22  they should have taken a long time ago before responding to the

23  summary judgment motion.

24          On top of that, what they are really looking for here

25  is two bites at the apple.  They want to have a deposition on

1   one day and another one twelve days later.  And that just flies

2   in the face of any common sense efficiency and undue burdensome

3   claim.  And with respect to --

4           THE COURT:  Well, would you prefer to have the

5   deposition on a later date once all the documents have been

6   received?

7           MR. SILVERIO:  Yes.  And I just checked.

8           So Mr. Blanco is available on December 12th or

9   December 13th and we can have the deposition of both UVI and

10  UTC on that date.  If Plaintiffs wish to file a Rule 56 motion

11  they may but, you know, it makes sense to have one deposition

12  in one day of Mr. Blanco.

13          THE COURT:  But that would be a date after the

14  response is due.  Is that the concern?

15          MS. MEYERS:  Correct.

16          THE COURT:  Okay.  Well, either way, whether she files

17  this Rule 56 motion or not, the idea is that we all want to be

18  efficient.  We all want to make sure that the deposition gets

19  done in a timely manner.

20          What is the response deadline for this motion?

21          MS. MEYERS:  December 9th.

22          THE COURT:  December the 9th?

23          MS. MEYERS:  Yes.

24          MR. SILVERIO:  Your Honor, I --

25          THE COURT:  So is there a date prior to that, Mr.

1    Norvell?

2           MR. NORVELL:  I do not know for certain Mr. Blanco's

3    schedule.  I would need to check with him on other available

4    dates.

5           THE COURT:  Okay.  So that is why there needs to be a

6    meet and confer, Miss Meyers, to determine if there are other

7    dates available for Mr. Blanco's deposition.

8           MS. MEYERS:  Yes.

9           THE COURT:  So I am not getting the impression, Mr.

10   Norvell, that the Plaintiffs want to do separate depositions.

11   I think they would like to get this all done in one day, but we

12   need to have a date in which that can be done.

13          MR. NORVELL:  Yes.

14          THE COURT:  And have enough opportunity to be review

15   the document production.

16           Do you have any response with respect to the document

17   production that can help me understand that situation?

18          MR. NORVELL:  Yes.  We've already produced a

19   significant portion of the documents and the remainder will be

20   produced today.  We are just working with our E-discovery

21   provider for the final protocol before the send button is hit

22   today.

23          THE COURT:  Okay.  So but you are not contesting that

24   the documents were just produced and that the production is not

25   complete?

1        MS. MEYERS:  Well, it is not complete, but we believe

2   that the parties are all working in good faith to complete the

3   production.

4        THE COURT:  Okay.  I appreciate hearing that.

5        Mr. Silverio, was there something that you needed to

6   add?

7        MR. SILVERIO:  Yes, Your Honor.

8        I just wanted to correct something.  I don't believe

9   -- and this is just to correct something for the Court.  I

10  don't believe their response is due November 9th.  I believe it

11  is due November 2nd.

12       THE COURT:  December 9th.

13       MR. SILVERIO:  I'm sorry.  Yes, it is not due

14  December 9th.  It is due December 2nd.  Under the local rules a

15  party has 14 days to respond in opposition to a motion.

16       So I am not quite sure -- I just wanted to sort of be

17  candid about that for the Court's consideration.

18       THE COURT:  Okay.  So that is another point.

19       All right.  So it makes sense, then, to have Mr.

20  Blanco appear for his deposition tomorrow, but I think that we

21  can make sure that he is not asked duplicative questions, Miss

22  Meyers.

23       And Mr. Norvell, you will be, I am sure, quick to

24  object if the questions that he is asked in the subsequent

25  deposition are duplicative; the questions that he was already

1  asked.

2          And that since it appears that there is no individual

3  deposition, it makes sense to go forward tomorrow with the

4  deposition with the caveat that he will not be asked

5  duplicative questions at a separate and subsequent deposition.

6          MR. SILVERIO:  Thank you, Your Honor.

7          MS. MEYERS:  Thank you.

8          THE COURT:  Okay.  Next, Mr. Silverio, the deposition

9  of the attorney --

10          MR. SILVERIO:  Yes, Your Honor, and this is being

11  handled by my colleague, Mr. Walch.

12          THE COURT:  Mr. Walch.  Okay.

13          So I have looked at case law on this.  It looks like

14  the case law is pretty clear that while it is permissible to

15  depose an attorney, there are some guidelines.  There are some

16  limitations to that in this *Nord Hodges* (phonetic) case.  It

17  says that -- let me pull up the test and see if we agree on

18  what the test is; the *Shelton* factors.

19          "No other means exist to obtain the information.  The

20  information is sought as relevant and non privileged and the

21  information is crucial to the preparation of the case.  And

22  some Courts in this circuit also require that the need for the

23  information sought must outweigh the dangers of deposing a

24  party's attorney."

25          Is that the law, Mr. Walch?

```
1            MR. WALCH:  Your Honor, you've got it right.

2            I was just going to cover that briefly if you don't

3   mind?  I will do this briefly since you've got it already

4   right, but I want to just highlight a couple of cases for you.

5            THE COURT:  Okay.

6            MR. WALCH:  Which I think you are already on top of.

7            If you don't mind I would like to share my screen and

8   show a presentation of a few cases that I want to discuss on

9   this topic.

10           THE COURT:  All right.

11           MR. WALCH:  And then I could apply it to the facts.

12  And you can obviously interrupt me if I am going too far here,

13  but you definitely have it right.

14           The Shelton case, I believe, is from the Eighth

15  Circuit and it has been followed by a few of the Southern

16  District of Florida cases, but there is also a standard that

17  has been set by Judge Gonzalez in the West Peninsula Title Co

18  case, which is 132 FRD 301, a Southern District case from 1990.

19           And that case has been followed by a number of the

20  cases and I think it was also cited by the one you referenced

21  as well.  I just want to walk through briefly how the Courts

22  have handled this issue, if you don't mind?

23           THE COURT:  Okay.  Do you have the ability to share

24  screen?

25           MR. WALCH:  I do.  I am going to do it right now and
```

1  hopefully this will work here.

2        THE COURT:  Okay.

3        MR. WALCH:  All right.  I am going to make this

4  hopefully bigger here shortly.  And do you see my screen now,

5  Your Honor?

6        THE COURT:  I do.

7        MR. WALCH:  Okay.  So as you identified, you know,

8  this is the motion concerning Dmitri Singh.  I want to just

9  give you some background on Mr. Singh and why we are seeking

10  this request.  It is an unusual circumstance for sure.

11        So on November 14th, HH Advertising obtained a

12  subpoena to depose Mr. Singh.  Mr. Singh is the former general

13  counsel of Defendant SRI Limited.  That is one of the

14  Defendants I represent.

15        He has also served as counsel for and provided legal

16  advice to SRI Limited affiliates.  Including the Defendant SRI

17  2000.  He has attended board meetings and has been involved in

18  the SRI 2000 business as well.

19        There has been a falling out between Mr. Singh and the

20  management at the SRI companies that I represent.  As of

21  September 10th of 2024, Mr. Singh initiated and is now pursuing

22  litigation against them in the Supreme Court of Jamaica.

23        And in those proceedings, he has disclosed certain

24  alleged privilege and confidential information.  Certain

25  information we also dispute actually the accuracy of it, but

1  the point is it would be privileged regardless if it was

2  accurate regarding various matters concerning the Sandals

3  business.  There is also some concerns about him disclosing

4  confidential information of the company without authority or

5  approval.

6        I know that is not as important, though, for the

7  purposes of our discussion, but the point is there is an

8  adverse relationship right now between Mr. Singh and my

9  clients, which has resulted in him disclosing or providing

10  information that we believe is not appropriate and potentially

11  creating potential serious waiver problems that we obviously

12  have significant issues with.

13        His employment has ended.  He is no longer employed as

14  we indicated and as you identified from our request.  There

15  are, as you pointed out, several key cases that deal with this.

16        The Crescent case is one of them from the Eighth

17  Circuit.  The *West Peninsular* case is the case that is cited by

18  almost all the authority we could find from the Southern

19  District.  And it sets out a very similar standard to the one

20  you articulated and it sets out some very important concepts

21  that I think apply here.

22        First, is the federal courts have held that

23  depositions of attorneys inherently constitute an invitation to

24  harass the attorneys and the parties and to disrupt and delay

25  of the case.

1      Here we are concerned about harassing the parties and

2  particularly invading the privilege or creating problems for

3  potential disclosures of privilege and waiver issues that cause

4  serious problems for my clients.

5      You know, moreover the costs are added to the

6  litigation.  Burdens are placed on the attorneys and the

7  attorney/client relationship is threatened.

8      As Judge Gonzalez noted the parties seeking such a

9  deposition has the burden of overcoming these presumptions.  In

10  other words, the burden lies with HH to get this information.

11  And Courts should exercise great care before permitting the

12  deposition of an attorney.

13      Judge Gonzalez went on to set forth the standard that

14  many of the Courts in this jurisdiction have applied, which is

15  the party seeking the deposition must demonstrate that the

16  deposition is the only practical means available of obtaining

17  the information.

18      In that section of the opinions Judge Gonzalez

19  recognized, for example, that written interrogatories could be

20  an alternative means of getting the information requested.

21      Judge Gonzalez also provided that the parties seeking

22  the deposition needs to show that the information sought will

23  not invade the realm of the attorney's work product or any

24  attorney/client privilege.  And also to show the information is

25  relevant and its need outweighs the danger of deposing a

1   party's attorney.

2          Judge Gonzalez went on to note that it is easy to

3   foresee that the questioning of Defendants' attorneys might

4   reveal information from confidential communications between the

5   Defendants and their attorneys.

6          This has been, as I indicated before, several courts

7   in this jurisdiction have found the *Peninsular* standard and

8   used the standard to reject requests to depose counsel as is

9   the case here.

10          I have identified four such cases here; the *Klayman*

11  case, the *Stull case, the Rocket Real Estate* case, and the

12  *Shenzen Kinwong* case all raised issues that were very similar

13  to the ones here.

14          And they indicated the parties seeking the depositions

15  had not met the burden, the stringent burden, that had been set

16  by the Courts to require that deposition to take place.

17          I just want to briefly cover the facts here that are

18  relevant that I think bear on this request and indicate

19  precisely why our requests in the *Peninsular* holding should

20  apply here and why the Court should grant our request.

21          Specifically and some of these facts we covered with

22  the request for Mr. Blanco's deposition.  You know, as Miss

23  Meyers noted, discovery closes on November 28th of 2024.

24          Just for the Court's benefit, discovery has been

25  opened for many months.  The last amended -- we were before you

1 in the spring on jurisdictional discovery, but the fact

2 discovery has been opened for several months.  The discovery

3 requests we are talking about now were served in October and

4 then these deposition notices came in November, but the fact is

5 discovery does close on November 28th.

6        The parties have agreed to take certain depositions

7 outside of the scope of the discovery cutoff and have received

8 permission from the Court to file certain pretrial motions

9 later in the schedule to allow for these depositions to be

10 completed.

11        But that current schedule is the third week of

12 December.  I think it is December 19th, I believe; the 17th or

13 19th.  But the point is we are trying to schedule depositions

14 and as we covered with Mr. Blanco, there are many depositions

15 to be scheduled for all the parties involved.

16        And we are doing this at the close of discovery, but

17 we are working hard to get that done.  But this particular

18 request with respect to Mr. Singh, we believe, is inappropriate

19 at this endpoint in discovery.  And in particular, this is why

20 the *Peninsular* factors come into play here.

21        HH Advertising has not sought to serve any written

22 interrogatories on any of the Sandals Defendants in merits

23 discovery.  So, in other words, they have not pursued

24 alternative means to get any of the information that they

25 allege they need from Mr. Singh through the means that the

1 *Peninsular* court and Judge Gonzalez recognized as necessary or

2 appropriate.

3       They have not yet taken a single merits deposition of

4 any employee of any of the Defendants.  Tomorrow will be the

5 first deposition to be taken in the case of Mr. Blanco.  They

6 have noticed up the depositions of the Sandals Defendants by

7 30(b)(6).  The first one is going to occur next week.

8       Again, that is an alternative means to get information

9 regarding what the Sandals Defendants know that has not been

10 pursued prior to seeking the deposition of the former general

11 counsel of one of the Defendants.

12       Most importantly, I think, is that Mr. Singh does not

13 have any non privileged knowledge that is relevant to this

14 narrow dispute.

15       As Your Honor may recall, this is an issue involving

16 copyright ownership and copyright infringement involving a

17 series of works that were generated in conjunction with

18 HH Advertising's work with the unique Defendants on behalf of

19 SRI 2000; one of my clients.

20       But the bulk of the engagement over the decades that

21 these parties have worked together to develop advertising has

22 been between Unique and the employees of Unique and HH and its

23 employees; not Mr. Singh.

24       In fact, the productions to date demonstrate as much.

25 We have not received any productions from the Plaintiffs yet.

1  So we have seen no documents from the Plaintiffs that

2  identified Mr. Singh with any relevance.  Nor do we expect to

3  do so because, as you will see from our documents Mr. Singh

4  has, at best, tangential relevance to the issues and we would

5  argue no relevance to the issues.

6        To date, HH Advertising has produced approximately

7  10,000 documents and Mr. Singh is only on a select few of those

8  documents and none of those documents demonstrate any Unique

9  relevance to Mr. Singh.

10        Sandals has produced a fraction of those documents,

11  again, because Sandals does not do the bulk of the work, of the

12  day-to-day work.  And only six of those documents reference

13  Mr. Singh and they all are involving instances where Mr. Singh

14  is forwarding or sending a long correspondence from HH

15  Advertising in conjunction with the disputes in this case.

16        In other words, he is serving as the counsel advising

17  his executive team regarding the litigation.  And in fact, we

18  have confirmed it from the HH Advertising -- or the Unique.

19  I'm sorry .  Unique advertising.  This is a mistake.  This

20  bullet here should be Unique has produced the 9,500 documents

21  and many going to make changes realtime here.

22        The Unique parties have produced those the 9,500

23  documents.  And from those documents, as I said, most of those

24  documents or many of those documents involve post litigation

25  correspondence where Mr. Singh is copied, but there is no

1    evidence or indication at all that Mr. Singh has any Unique

2    knowledge or any appropriate testimony that he could provide

3    that would not involve privilege or invade on the privilege

4    with respect on the issues in the case.

5          And as a result, we have requested that his deposition

6    subpoena be quashed and that they not be allowed to proceed

7    with that deposition.

8          We believe that is the right result given the case law

9    that we have presented.  And the facts that I have presented

10   that, at the very least, HH Advertising should have to proceed

11   with the other discovery before taking on this significant

12   burden of requiring a former general counsel to be deposed.

13         But I would submit that they be cannot meet the burden

14   to support that, regardless.  And in fact, I would just add

15   that in our meet and confer discussions, the only relevance

16   that counsel for HH Advertising has identified with respect to

17   Mr. Singh is that he has knowledge about copyright issues and

18   the litigation.

19         But that is exactly the province of attorney/client

20   privilege and work product materials and does not warrant or

21   support the deposition of general counsel of the potential

22   invasion of the attorney/client privilege as we have submitted

23   here.

24         THE COURT:  Thank you.

25         MR. WALCH:  Obviously, I will answer any questions you

1  may have, but that is the basis for our request.

2        THE COURT:  Okay.  Very good.  So let me go to Miss

3  Meyers now.

4        MS. MEYERS:  Thank you.

5        I think a bit of background would be helpful to the

6  Court to understand why this deposition is critically

7  important.

8        Mr. Singh has been in-house counsel for Sandals for

9  many years.  And the founder of Sandals, who is referred to

10  really as Butch Stewart, is Gordon Butch Stewart, but I will

11  refer to him as Butch Stewart, passed away unfortunately in

12  January of 2021.

13        Mr. Singh knew Mr. Stewart very well and because Mr.

14  Stewart is no longer here, a lot of the communications with him

15  and our client become very important in this case.

16        What Sandals is trying to do is to keep Mr. Singh from

17  testifying regarding facts that he knows that they believe will

18  hurt their case.  For about one year we litigated

19  jurisdictional discovery against SRI Limited and they fought it

20  and they denied that they should even be in this case.

21        Instead, they parroted this repeated position that

22  another Defendant, SRI 2000, was the right entity that should

23  be the Defendant in this case and our client had no

24  relationship with SRI 2000.  Our client never heard of SRI 2000

25  before this litigation.

1          I mean, it was just like literally a false narrative

2   and we ultimately had a hearing, which I think was like a

3   pivotal hearing in the case because it took about, I would say,

4   about five months with a lot of jurisdictional discovery.

5   Including the current chairman, of SRI Limited testifying, Adam

6   Stewart.

7          And the Court entered an order.  Judge Altonaga

8   entered an order granting a motion to dismiss and allowing SRI

9   Limited out of the case because the Court felt that we had not

10  justified sufficient contacts for SRI Limited.

11         And we knew all along that SRI 2000, our client had no

12  relationship with.  So we continued to investigate and do

13  research.  And we ultimately learned by obtaining documents

14  from the Panamanian government, which is where SRI 2000 is

15  based, that neither Adam Stewart nor Butch Stewart ever held a

16  position as a director, chairman, any position as an employee

17  or otherwise with SRI 2000.

18         So this relationship that our client had primarily

19  with Butch Stewart over 30 years that they worked on

20  advertising, who was that with?

21         I mean, it had to have been SRI Limited and not SRI

22  2000.  SRI 2000 did not have a person that could have been

23  interacting with our client because he was not acting on behalf

24  of SRI 2000.

25         We also presented e-mail communications that Adam

1  Stewart had with our client and all of those e-mail

2  communications listed his title as chairman, CEO, SRI Limited.

3  We went to a hearing in front of Magistrate Judge Damian and on

4  that basis, based on all of those communications is what got us

5  the deposition of Mr. Stewart.

6          And when Alan Kluger showed Mr. Stewart all of these

7  e-mails, Adam Stewart denied that he was acting in that

8  capacity when he sent these e-mails to HH Advertising.

9          Instead, he said, well, it might say that, but

10 actually I was acting on behalf of SRI 2000.  And we said,

11 well, why didn't your title say SRI 2000?  How are you saying

12 that you were acting on behalf of SRI 2000 if your title says

13 that?

14         Well, I was deputy chairman and SRI 2000 handles all

15 of the marketing and that is the capacity that I was working

16 in.  And we were just scratching our heads because we knew that

17 was not the relationship our client, who knew SRI Limited and

18 its founder very well, knew that that was not the case.

19         And that is when they went ahead and investigated and

20 finally obtained the documents from Panama, which show that

21 neither Butch Stewart nor Adam Stewart ever held a position at

22 SRI 2000.

23         Plus, we challenged the Defendants and said, like,

24 show us where he was ever appointed in that.  Even internally

25 and maybe he wasn't a director and maybe he wasn't a chairman.

1    It came up zero.  Nothing.

2          So we went back to Judge Altonaga and we sought a

3    motion for leave to file an amended complaint bringing SRI

4    Limited back in the case.  And we presented all this evidence

5    to Judge Altonaga and she changed her mind and she allowed SRI

6    Limited to be in the case.

7          I mean, to us it appeared that Mr. Stewart had not

8    given completely honest testimony regarding his role in SRI

9    2000.  She said that in that order I am not going to conclude

10   that he has given false testimony, or that he has perjured

11   himself, but that fact is out there, but I find enough basis to

12   include SRI Limited in this case.

13         And the case continued from that point, but we spent a

14   lot of time on this issue.  There is nobody -- nobody and I am

15   sure that I have disagreement from them that will say on the

16   Defense side that SRI 2000 that neither Butch Stewart nor Adam

17   was acting on behalf of SRI 2000.

18         They are going to insist that at all times they were

19   acting on behalf of SRI 2000.  And their motion for summary

20   judgment, which they just filed on November 18th is consistent

21   with that position.

22         So we literally took a year of discovery and got

23   nowhere with the exception of our own efforts to discover the

24   fact through the Panamanian government.  So I am sure there is

25   no other witness.

1      I believe that Dmitri --

2      THE COURT:  So then just to bring that back to Mr.

3  Singh, what is it that you want to find out from him that is

4  not alleged?

5      MS. MEYERS:  I believe that Mr. Singh will testify

6  that neither Adam Stewart nor Butch Stewart were ever

7  directors, chairmans, employees of SRI 2000.  I think that is a

8  fact that he will testify to.

9      I think they want to prevent him from testifying to

10  that, but there is nothing privileged about that communication.

11  He, as in-house counsel, was aware of many different aspects of

12  all the different companies.  He was the only in-house counsel.

13  And it is a fact and they should not prevent him from

14  testifying about.  I mean --

15      THE COURT:  Is that the only question you have for

16  him?

17      MS. MEYERS:  No.  There were a couple of other

18  questions.

19      THE COURT:  So you are showing me that the information

20  is relevant to your case.

21      You are alleging there is no other means that exist to

22  obtain the information, but what I am hearing is that you got

23  information, otherwise, from looking at Panamanian documents.

24      So there is another way to determine --

25      MS. MEYERS:  It is inconclusive in taking the position

1  that they still deny it and the Judge has not said that it has

2  been determined.  Obviously if we --

3         THE COURT:  The Judge just allowed you to do the third

4  amendment --

5         MS. MEYERS:  Correct.

6         THE COURT:  -- but it is still a determined fact.

7         Okay.  So you need to, then, verify the information

8  that you so far have and you believe there is no other means to

9  get it.

10        MS. MEYERS:  Correct.

11        THE COURT:  And you believe it is crucial and why is

12  it crucial?

13        MS. MEYERS:  Because they are defending here that we

14  are accused of copyright infringement; SRI Limited is accused

15  of copyright infringement.  We do not think SRI 2000.

16        We have included them at the urging of Defendants who

17  say they must be in here.  We have sued them for contributory

18  copyright infringement, but we really believe and I think when

19  you put on a case during trial before a jury and you put up

20  e-mails and communications that it should bear some

21  relationship to reality.

22        I mean, that is our case that this was the

23  relationship between SRI Limited and our client and all these

24  communications are how it developed.  And we should not be

25  forced to be put into this square box and say it was SRI 2000

 1  when it wasn't.

 2          THE COURT:  So, essentially, you want him -- Mr. Singh

 3  -- to testify as to who exactly was his client?  I am trying to

 4  see --

 5          MS. MEYERS:  No, I think it was just --

 6          THE COURT:  Or whether, I guess, Mr. Adam Stewart and

 7  Butch Stewart were officers of SRI 2000.

 8          MS. MEYERS:  Correct.  Was Gordon Butch sued as an

 9  officer, director, or employee of SRI 2000?

10          THE COURT:  And how would he have that information?

11  He would know that information because he is corporate counsel.

12          MS. MEYERS:  Correct.

13          THE COURT:  Wouldn't that make it privileged?

14          MS. MEYERS:  No.  I think it is a fact and they have

15  taken the position otherwise in this case.  I mean, it is

16  almost like is a fact privileged because they want to keep it

17  secret?

18          THE COURT:  Well, I mean, I understand a fact might be

19  there was a meeting held on a particular day and he was there.

20  That would be a fact.  There is a corporate document that says

21  who were the officers of a corporation were.  That would be a

22  fact.

23          But to ask an attorney who these particular

24  individuals were acting on behalf of when they sent e-mails or

25  had certain discussions, how would that be a fact?

1          MS. MEYERS:  That's not the question.

2          I'm sorry if I misstated that.  It is not who they

3   were acting on behalf of.  It is just the very pure question of

4   was Gordon Butch Stewart ever an officer, chairman, or employee

5   of SRI 2000, period?

6          THE COURT:  And how would he have that information?

7   He would know that because he is the corporate attorney for SRI

8   Limited?

9          MS. MEYERS:  Correct.

10         THE COURT:  Okay.

11         MS. MEYERS:  For all of the companies, yes.

12         THE COURT:  He was also the corporate lawyer for SRI

13  2000?

14         MS. MEYERS:  Yes.

15         THE COURT:  Okay.  All right.  Let me go back to Mr.

16  Walch.

17         Now that we know exactly what she wants to ask is that

18  privileged?

19         MR. WALCH:  First of all, the knowledge of the

20  corporate structure of the companies and who is working for

21  whom, to the extent that the attorney knows that that is based

22  on the corporate structure that has been set up by the counsel

23  and/or the outside law firms that they are working with.  I

24  think that it is privileged.

25         And I think also that this is something that very

1  easily could have been discovered through a written discovery

2  request; identify all roles that Mr. Stewart had with SRI 2000.

3  Take a 30(b)(6) deposition and ask that question.

4         They could do that very easily through all kinds of

5  alternative means other than deposing the general counsel of

6  SRI Limited and the counsel for SRI 2000 to get that

7  information.

8         The other point I make, though, I am not even sure how

9  it is relevant to the issues of the case.  The reality is

10  infringement is established by use of a copyrighted work.

11  Whoever is using the copyrighted works is going be to liable

12  for infringement.

13         We are submitting that SRI Limited has not used the

14  works.  SRI 2000 is because it is the one responsible for doing

15  the advertising.  So that is the issue in the case.  This is a

16  red herring.

17         This might be relevant to the jurisdictional issues we

18  covered six months ago, but it is not relevant to the issues

19  before the Court now, which is who owns the works and were they

20  infringed?  Those questions are very straightforward .

21         I think last, but not least, I just highlight the fact

22  that this is even more of a red herring because when you think

23  about it, who did they communicate with?  Thousands of

24  communications were Unique.  Day-to-day communications were

25  Unique.

1          Unique is the party that is relevant here.  And we

2   have produced the contract between Unique and SRI 2000.  There

3   is no contract between SRI Limited and Unique because they are

4   not responsible for the advertising.

5          That is why SRI 2000 said from the get-go we are the

6   copyright owner.  We are the one responsible for the

7   advertising.  We are the parent company.  We will pay any

8   infringement finding that you can find, which we don't think

9   they will find.

10          The point is this is a big wild goose chase looking at

11   the corporate structure and trying to depose counsel about the

12   corporate structure and who is employed by whom, but it has

13   nothing to do with the issues in the case.  And so that is why

14   this is not appropriate.  It does not even come close to

15   covering what is relevant to the issues in the case.

16          It does invade on privilege issues.  Including

17   corporate structure and how the organizations are formed and

18   who is the director and who is not a director and what their

19   responsibility was for, you know, who they were acting on

20   behalf of.  That is part of the corporate and legal structure

21   of the organizations.

22          MS. MEYERS:  Your Honor, may I respond, please?

23          THE COURT:  Yes, you may.

24          MS. MEYERS:  This is a huge cover-up.

25          And I really hope that we get the opportunity to ask

1  Mr. Singh this question.  It is very narrowly tailored and we

2  are lucky to discover what we discovered on our own.

3          We have asked these questions and Mr. Stewart was not

4  truthful.  So we should not be left not being able to get to

5  the bottom of this in this case.

6          There is one witness that can give a factual answer

7  that does not impinge on attorney/client.  If it was

8  attorney/client when Mr. Stewart, when we asked Mr. Stewart

9  that question, he would have objected to providing that

10 information.  This is literally a fact.  There are also some

11 other questions that I have.

12         THE COURT:  Here's what my thoughts are at this point.

13 The corporate structure is privileged and the attorney who is

14 giving that information would need the permission of the client

15 in order to give it.

16         As far as whether there is no means that exist to

17 obtain the information, what I hear you saying is no means

18 exist because everyone else is lying to you, but that does not

19 mean no means exist.

20         That just means that now you have a way of convincing

21 the jury that they are lying because here you have their

22 testimony and here you have certain documents.

23         So you can present that to the jury as your proof, but

24 the fact that somebody else has said something that you do not

25 believe to be true does not necessarily mean you have no other

```
 1   means of finding out who --

 2            MS. MEYERS:  The part I am not --

 3            THE COURT:  -- the party acted on behalf of.

 4            MS. MEYERS:  The corporate structure being privileged,

 5   that has been widely discussed in the case and they have

 6   produced documents with respect to corporate structure and they

 7   have never --

 8            THE COURT:  Okay.  If --

 9            MS. MEYERS:  -- made an issue --

10            THE COURT:  Okay.

11            MS. MEYERS:  -- as being privileged.

12            So Mr. Singh would just be bearing on an issue that

13   has been widely discussed in the case.

14            THE COURT:  Okay.  So you are saying the client,

15   meaning Adam -- tell me the last name again.

16            MS. MEYERS:  Adam Stewart.

17            THE COURT:  Adam Stewart has already testified as to

18   corporate structure?

19            MS. MEYERS:  Yes.  And we sought written discovery

20   regarding corporate structure and received documents regarding

21   corporate structure.  And not once did they raise any objection

22   as to privilege of the corporate structure.

23            So I guess I am not understanding how corporate

24   structure fits into a privilege topic since they have never

25   maintained it as being privileged.
```

```
 1          THE COURT:  So you are saying it is waived, but then
 2    that throws you back into no other means exist to obtain the
 3    information.  It sounds like there are other ways to obtain it
 4    and they have --
 5          MS. MEYERS:  No, they haven't --
 6          THE COURT:  It is a Catch-22 for you, the argument.
 7          The goal if it is not privileged because they have
 8    waived it, that means you have the information.  Whether you
 9    believe it to be true or not true, or whether it is contrary to
10    other information you have, does not mean you have no other
11    ways of getting it.
12          Do you see what I am saying, Miss Meyers?
13          MS. MEYERS:  I mean, I think he is the only one that
14    can bear on this because everyone else is not going to --
15          THE COURT:  Is not going to lie to you.  I get it.
16          MS. MEYERS:  I think --
17          MR. WALCH:  Your Honor, can I address that?
18          MS. MEYERS:  Hold on.  Before you get there --
19          THE COURT:  You need to --
20          MS. MEYERS:  I had some other questions because there
21    were like four questions that I wanted to ask this witness.  So
22    can we move on to those other questions?
23          THE COURT:  Yes.
24          MS. MEYERS:  The second question was:
25          Were you aware that HH Advertising sent cease and
```

1  desist letters to third parties advising that it owned the

2  copyrights and demanded that they cease and desist.

3          In terms of being in-house counsel, frequently

4  in-house counsel sees copies of correspondence that are sent.

5  And here, HH Advertising owned the copyrights and we believe

6  Mr. Singh would be aware of that and that is an issue because

7  they are claiming implied license.

8          They are claiming that they, you know, did not know

9  that we registered these copyrights and that it was, you know,

10 never -- there was nothing in writing.  And we believe Mr.

11 Singh may be aware of it because those letters likely crossed

12 his desk at some point and would be very relevant to the case.

13         THE COURT:  It is definitely privileged.

14         MS. MEYERS:  Privileged as to whether --

15         THE COURT:  You are asking him whether he was aware of

16 a legal position that HH was taking?

17         MS. MEYERS:  No.  Whether he saw any letters.

18         Any letters that were written to third parties.  These

19 would be public -- these would be letters that HH's counsel

20 sent to a third party who was using their content, who was

21 using their copyrights, and they were seeking to enforce their

22 rights.

23         And as a matter of routine sent that to counsel for

24 Sandals so that they were aware that they were seeking it.

25 There is nothing privileged about that relationship between

 1  counsel for HH and Sandals.

 2          THE COURT:  Who is the third party?

 3          MS. MEYERS:  There were various third parties that

 4  HH's counsel sent to potential infringers because they were

 5  using Sandals' content.

 6          And because HH, all in the copyrights, they were

 7  protecting those copyrights by sending cease and desist

 8  letters.  And a matter of course sent those letters to counsel

 9  for Sandals so they were aware that they were enforcing their

10  rights.

11          THE COURT:  Okay.  Go ahead.  Your next question.

12          MS. MEYERS:  The next question is:

13          In 2019 there was a sale that was planned to a private

14  equity firm that Sandals was going to be sold.  And in

15  connection with that sale, Butch Stewart who has passed away,

16  told our client, our principal of HH Advertising, told her that

17  -- asked her first if as part of this sale you would need to

18  convey those copyrights in order to give the copyrights to this

19  buyer.

20          Are you willing to do that?  You would either need to

21  convey them to Sandals or you would need to convey them to the

22  buyer at the closing or prior to the closing.

23          Is that something that you would agree to do?  And she

24  said, yes, and he told her that she would be fairly compensated

25  for that in the event that that occurs, but he needed to know

1  before they went further that she would be willing to do that

2  and she agreed.  And that is something that has been pled in

3  the complaint and it is part of the case.

4        Because Butch Stewart has passed away, other than

5  Tracy Hunter, who knew that there was no one else that could

6  testify about that.  And we believe that Mr. Singh was present

7  during that conversation with Miss Hunter and Butch Stewart.

8        It would not be privileged because Tracy would be

9  there, the principal of HH.  And if he isn't aware of it, he

10  would say, no, but we believe that he was a witness to that

11  conversation.

12        THE COURT:  Okay.  What else?

13        MS. MEYERS:  Do you know whether HH Advertising owns

14  the copyrights for all of the content and creative work it has

15  created over the years?

16        I mean, that is related really to the question of this

17  -- similar to this cease and desist question and that is it.

18  Those are all the questions very narrowly tailored to the case.

19        THE COURT:  Well, I understand the tailor.

20        But, again, we go back to the only way Mr. Singh would

21  be able to answer those questions is through his knowledge of

22  the company as the company attorney.

23        Now as far as the question was he present during a

24  specific conversation, he can answer yes or no.  That is a

25  fact, but the rest of it is information he would have in his

1    capacity as corporate counsel.  As such, that is privileged

2    information.

3           Now, I guess the next question would be, but is there

4    no other way for you to get the information?  As far as the

5    conversation where nobody else was there, but him, perhaps that

6    would be a situation when there is no other means available.

7           MS. MEYERS:  Well, the other people that were present

8    Roger Severey (phonetic) and Butch Stewart has since passed

9    away.  So that would be the only way to get that information.

10          Also, there is another case that has not been

11   discussed much; *Palmisano v. Paragon*, which is a Southern

12   District case at 2021 West Law 1686948 and in that order it

13   says:

14          "The attorney/client privilege only extends to

15   communications.  It does not extend to underlying facts.  The

16   attorney/client privilege simply does not extend to facts known

17   to a party that are central to the party's claims, even if such

18   facts came to be known through communications through counsel

19   who had obtained knowledge of those facts through an

20   investigation into the underlying dispute.

21          It is well established that a party may not withhold

22   relevant facts from disclosure simply because they were

23   communicated to or learned from the party's attorney."

24          And that particular situation where Mr. Singh may have

25   been present and heard that conversation and would be the only

1  other person alive, other than Tracy Hunter, that would be an

2  important thing that he could testify to and very relevant to

3  the case.

4           THE COURT:  Okay.  So let me go back to Mr. Walch.

5           The only other concern I have, then, is this 2019

6  conversation where supposedly everybody else who was there if,

7  in fact, Mr. Singh was there, has passed away.

8           Is it appropriate, then, for Miss Meyers to ask the

9  attorney, first of all, whether he was there during that

10  conversation.  Let's start with that question.

11          MR. WALCH:  Again, I don't think that the need for it

12  is that great.  I mean, look, they are going to testify to this

13  fact regardless, right?  And we don't have a counter to it.

14          So, I mean, whether he validates it or not, you have

15  an adverse inference validating something that they are

16  claiming that we are not going to be able to contest anyway.

17          So I just don't think the urgency is there to require

18  it, but if you were doing a single question about that, I guess

19  it is okay, but it sure seems like a waste of time.

20          THE COURT:  Question of fact is there or not there.

21          MR. WALCH:  Was he there or not, right, but the one

22  thing that he is asked about is --

23          THE COURT:  (Inaudible).

24          MR. WALCH:  -- why was the discussion had?  What did

25  you talk about about the ownership of the copyrights and why

1   did Mr. Stewart ask this question or what was the discussion

2   had with Mr. Stewart afterwards about that question and that is

3   all invading on the attorney/client privilege.

4          He is Mr. Stewart's counsel acting as his counsel in

5   those discussions.  So short of the question of did Miss Hunter

6   say this or did Miss Hammersmith say this at this conversation,

7   that is it.  Anything else is invading on a privilege.

8          THE COURT:  And the fact that there is no one else

9   alive who can relay the information.

10         MR. WALCH:  Well, they are alive.  They are alive and

11  they will claim it, right?

12         So they've already got that.  They will say that they

13  said it.  They will say that he was there.  I can tell you

14  right now we are not going to be calling him to dispute it.  So

15  they've got that claim already.

16         You know, just because Mr. Singh says, yes, that is

17  what she said is not going to change anything.  Because, you

18  know, obviously we think it might even go against them because

19  it is going to show an adverse party trying to coerce, you

20  know, to conspire with them, but it does not change anything.

21         I mean, they are going to make that claim.  We are

22  going to dispute it on the merits, right?  We are going to

23  dispute it on the merits because we can't talk about that

24  conversation.  We don't know -- Mr. Stewart and Mr. Severey

25  are not available to testify about it.

1          So they are going to claim it and we are going to

2    dispute it.

3          THE COURT:  Right.  So nobody is going to bring it up.

4          MR. WALCH:  Yes.

5          THE COURT:  Okay.

6          MR. WALCH:  So Mr. Singh just simply saying, yeah,

7    that happened is not going to change anything.

8          THE COURT:  Okay.  Yes, Miss Meyers, my concern is

9    that all of that information would come from attorney/client

10   privilege.

11         And that because the Courts are cautious about whether

12   the attorney should be able to testify with regard to

13   information that he obtained as a result of his representation

14   of the party, it becomes even more problematic for this Court

15   to grant you that ability to ask those questions.

16         And then, let me take a look at the case you were

17   talking about; the 2021 case.  How did you feel that case -- I

18   want to make sure I understand the case and why you think it

19   helps you.

20         MS. MEYERS:  Because it deals with attorney/client

21   privilege.

22         THE COURT:  Let me pull it up.

23         MS. MEYERS:  It's 2021.

24         THE COURT:  2021.

25         MS. MEYERS:  West Law 1686948.

1          THE COURT:  *Palmisano v. Paragon.*

2          MS. MEYERS:  And I was referring to on Page 5 about

3    the asterisk 6, which is Page 6.

4          I mean, otherwise -- and I don't see the limitations

5    that are created by the case law, if you meet all three factors

6    you should be entitled to obtain the testimony.

7          Otherwise, you would just essentially be putting like

8    a blanket bar on ever eliciting any factual testimony from

9    anyone that served as in-house counsel.  We meet those factors.

10         So we are able to show that we have no other way of

11   getting it.  We have no intention to elicit any attorney/client

12   communications.  We are not asking what they discussed with

13   their clients.

14         We are merely asking for some very basic information

15   that for, at least two of the examples, a third party is

16   involved and present.  The letters that were sent to third

17   parties and Mr. Singh witnessing the communication between

18   Butch Stewart, who has passed away, and Tracy for which he

19   assured she would be compensated if she agreed to transfer the

20   copyrights.

21         THE COURT:  Okay.  I am taking a look at Judge Snow's

22   order:

23         "Attorney/client privilege only extends to

24   communications.  It does not extend to the underlying facts.

25   That is why the privilege applies when a question directly asks

1  a deponent about discussions with counsel.

2          The attorney/client privilege simply does not extend

3  to facts known to a party that is essential to the party's

4  claims compelling disclosure over the Defendant's objection

5  they had no independent knowledge of the underlying facts

6  outside of those learned through counsel."

7          MR. WALCH:  Your Honor, can I address that case

8  briefly?  I don't want to interrupt you.

9          THE COURT:  Two seconds.

10         MR. WALCH:  Yes.

11         THE COURT:  "However, the privilege does not extend to

12 facts learned from counsel if disclosure would also reveal

13 counsel's legal advice."

14         And that case to the extent that *Paragon* seeks

15 knowledge about the basis for specific factual allegations, the

16 information is not privileged regardless about how *Palmisano*

17 learned the facts.

18         Okay.  But it does seem that you are asking for

19 discussions and communications between the client and HH.

20         MS. MEYERS:  Which is our client.

21         THE COURT:  And the reason he is there during that

22 discussion, even assuming he was, was because he was there to

23 advise his client.

24         MS. MEYERS:  But those communications are not

25 privileged.  It is simply an observation.  I mean, certainly

1  whatever it was he overheard or saw, there is nothing in that

2  communication in observing it that involves attorney/client.

3        You know, what he did next, or what he told his

4  client, or what his suggestion was in terms of conveying that,

5  all attorney/client.  But the factual witnessing that where two

6  witnesses are no longer alive seems, to me, the ideal situation

7  where you would make an exception and allow that testimony to

8  come in.

9        THE COURT:  All right.

10        MS. MEYERS:  And going back to the issue --

11        THE COURT:  All right.  Thank you so much.

12        I just want to make sure we get time to look at all of

13  the other issues.

14        Mr. Walch, you wanted to talk about this case as well?

15        MR. WALCH:  Yes.  I just wanted to say that case is

16  inapplicable.  That deals with whether a non attorney can

17  answer a question.  That is about facts that a non attorney

18  knows.  That is not an issue of whether or not you can

19  subpoena, or depose a general counsel, or an in-house counsel

20  in a setting like this.

21        I would also note Judge Snow's ruling that is citing

22  *Sun Capital Partners*.  I am going to get to the case right

23  here.  It is *OJ Commerce LLC v. Beazley*.  It is unfortunately

24  unpublished.  It is 2020 West Law 13882031 and in that decision

25  Magistrate Judge Snow says:

1          "The undersigned lawyers conclude that there are

2   currently less intrusive means of discovery such as

3   interrogatories, request for admissions, and depositions of

4   other employees that have not been exhausted."

5          And short of this question about whether or not Mr.

6   Singh was present in a particular conversation, everything we

7   are talking about has not been exhausted.

8          For example, there has been no request of any of the

9   Sandals parties for these particular alleged cease and desist

10  letters.  To be honest, they can use them anyway.  It does not

11  bear on the issues in the case because they can send a cease

12  and desist letter.

13          Under either theory, or either co-owners, which allows

14  them to send a cease and desist letter, or were implied license

15  holders, which also allows them to send a cease and desist

16  letter.

17          THE COURT:  All right.

18          MR. WALCH:  So the fact that we know about a cease and

19  desist letter being sent by HH has no bearing on the issues in

20  the case.  In any event, they can use those letters if they've

21  got a copy of them being sent to us and point them out.

22          It is really just not relevant to the issues.  I think

23  you are already with us on that and understand that, but his

24  receipt of those and processing of those, as counsel for the

25  Sandals entities, is not relevant to the issue in the case.

1 And certainly not appropriate under the standards that this

2 Court has set.

3        The last question is kind of astonishing.  It is like

4 do you know whether HH copyrights.  I mean, that is as question

5 of legal counsel.  He's got to weigh in as the legal counsel on

6 what copyrights rights are and who owns them.  That is the

7 epitome of a privilege question that would be entirely

8 inappropriate.

9        So, you know, Your Honor, I submit that having one

10 question about whether he witnessed a conversation that they

11 already are going to testify about, seems like a waste of time

12 and effort, but if that is the one question that we have to

13 defend, we will do that.

14       We will have to establish the adverse nature of Mr.

15 Singh to our clients when he vowed it when he allegedly

16 verifies this conversation took place.  It is a waste of time,

17 but we will do it if that is where Your Honor wants to go, but

18 the rest of this all invades on the privilege and raises the

19 very issues that *Peninsular* highlights.

20       THE COURT:  All right.  Thank you.

21       So let's put this aside for the meantime and go on to

22 the next issue.  What else do we need to discuss today?  There

23 are two other witnesses.

24       MR. NORVELL:  Sorry, Your Honor.  I had it on mute.

25 This is Joe Norvell on behalf of the Unique entities.

```
 1              THE COURT:  Okay.

 2              MR. NORVELL:  So the next issue we would like to raise

 3    is the deposition of Tammy Gonzalez that has been noticed by

 4    the Plaintiff HH.

 5              THE COURT:  Okay.

 6              MR. NORVELL:  So Tammy Gonzalez is a former now

 7    retired CEO.  She was the CEO of Unique Vacations, Inc., UVI,

 8    from 2016 to 2020.

 9              THE COURT:  Okay.

10              MR. NORVELL:  And I have a little bit of a deja vu on

11    this because we have already gone through this previously with

12    Judge Damian when we were in the jurisdictional discovery.

13              And in that situation, Judge Damian found -- and it is

14    docket number 95, quote:

15              "Plaintiff fails to adequately demonstrate that

16    Gonzalez has Unique nonrepetitive firsthand knowledge about

17    matters now at issue."

18              And that is the exact same situation that we have

19    here.  So the reason why the deposition --

20              THE COURT:  For jurisdictional discovery, right?  And

21    now we are at discovery.  Why wouldn't she have knowledge of

22    copyright information?

23              MR. NORVELL:  So, first of all, the reason why her

24    deposition does not need to be taken -- and I would like to

25    point out that she is a former employee and a former employee's
```

1  status as a nonparty.

2        And so it creates an additional burden and that is

3  under the case of *Jordan v. Commission* in the Eleventh Circuit.

4        And under the apex doctrine there are two primary

5  reasons. First, she does not have any Unique information.  And

6  second, there are less burdensome means here.  Especially

7  against a nonparty.

8        So, Miss Gonzalez has been retired now for over four

9  and-a-half years.  She has not been involved in any of this

10  recent dispute about who owns copyright.

11        On top of that, the information they are seeking is

12  wholly duplicative.  As we have said, we have tomorrow, the

13  Andrew Blanco deposition of the COO and he has been with the

14  Unique companies for over 25 years.

15        And so he can speak on behalf of the companies with

16  that knowledge.  There is also less burdensome means via the

17  deposition of Mr. Blanco.

18        Also, we are going to be producing for depositions the

19  Chief Marketing Officer who, of course, is the pivotal person

20  when it comes to copyright issues involving advertising.  As

21  well as the Global Vice President of Website Design and that is

22  Mario Kuhns (phonetic).

23        So when you look at those factors, there are others

24  with more direct knowledge of these facts.  And there are less

25  intrusive means and there is no reason to go fishing after

 1  former employees.

 2          THE COURT:  Okay.  And Jeff Clark is the same

 3  argument, also a former CEO at some point?

 4          MR. NORVELL:  Correct.

 5          And again, because we are producing 30(b)(6).  We are

 6  producing the COO.  We are producing the Chief Marketing

 7  Officer and the Global Vice President of Website Design.

 8          THE COURT:  Okay.  But as I understand HH's pace, this

 9  has been an ongoing advertising relationship for a number of

10  years.  And these past CEOs would have information as to what

11  the relationship was doing in the timeframe that they were

12  CEOs, true?

13          MR. NORVELL:  I do want to clarify something,

14  obviously.  Mr. Jeff Clark is the current CEO.

15          THE COURT:  Oh, he's the current CEO.  So he is even

16  more compelling, then.

17          MR. NORVELL:  Yes.

18          THE COURT:  Okay.  Let me go back to Miss Meyers,

19  then, and hear your argument.

20          MS. MEYERS:  So just to correct what Mr. Norvell said,

21  Tammy Gonzalez was employed by Unique from 1985 to 2020.

22          So her longevity with the company is very extensive.

23  And at the time when she left the company, she was CEO, but she

24  has broad extensive knowledge.

25          She knew Butch Stewart very well and she knew the

1    working of the relationship between HH Advertising and the

2    Defendants.  She knew the day-to-day.  She often communicated

3    with Tracy Hunter and Cheryl Hammersmith.

4         She will be able to shed a lot of light on how the

5    creative work was developed and what function, if any, Unique

6    served in it.

7         And we oppose very strongly that Unique had any role

8    in creating any of these works they are claiming to be joint

9    authors and we believe that the evidence will bear out.

10   Including Tammy Gonzalez' testimony that they played merely a

11   supportive role and that all of the content was developed by

12   HH Advertising.

13        The other witnesses that they are talking about, Tony

14   Cortese was gone from the company for a significant period of

15   time from 2007 to -- I believe he was absent from the company

16   between 2006 to 2021.

17        So that is a very long period of time.  In fact, it is

18   the primary part of the relationship.  Our client began working

19   with Sandals in 1995.  So Miss Gonzalez' knowledge really

20   covers that entire period of time.

21        THE COURT:  All right.  So I think it is appropriate

22   for you to be able to depose Miss Gonzalez.  Is there an amount

23   of time that you think that deposition might take?

24        MS. MEYERS:  I mean, it won't take longer than a day.

25   I mean, I think probably four to five hours would probably be

1   enough.

2          MR. WALCH:  Your Honor, just to clarify, you know,

3   Mr. Cortese is the Chief Marketing Officer.

4          She is correct on when he came back to UVI.  He was

5   previously an employee there and even before that many years

6   ago, he was an employee of HH Advertising, the Plaintiff in

7   this case.  So he has a lot of knowledge about --

8          THE COURT:  And I don't doubt that, but I don't think

9   that really is the deciding factor.

10          Certainly someone who is CEO for such a long period of

11   time when the material that HH is claiming was created by them

12   was used by the company, I think it is appropriate for HH to be

13   able to depose Miss Gonzalez, a long time CEO of UVI.

14          As far as the current CEO of UVI that seems

15   appropriate, too.  My only concern is that this is not drawn

16   out duplicative and asking for the same information over the

17   same period of time by a multiple number of witnesses.

18          So that is why I am asking Miss Meyers how long do you

19   think you would need to depose this witness?

20          MS. MEYERS:  To depose Tammy Gonzalez?

21          THE COURT:  Yes.

22          MS. MEYERS:  I don't think more than five hours.

23          THE COURT:  More than five hours.  And Mr. Clark?

24          MS. MEYERS:  Mr. Clark, we had hoped that they were

25   producing him as the 30(b)(6) witness, since he is the current

1  CEO, but they are not.  They are producing Mr. Blanco who is a

2  financial -- who has only financial knowledge.

3        So the only knowledge he is going to have is the

4  knowledge he has learned to answer questions, which still makes

5  him important to do so that we get the information that we need

6  but --

7        THE COURT:  And Mr. Clark was the CEO starting when?

8  Was he 2020 right after Miss Gonzalez?

9        MR. WALCH:  So, yeah, Mr. Clark is CEO in 2016.

10        I'm sorry.  In 2020 to present.  He was the Chief

11  Operating Officer from 2016 to 2020, which by the way Mr.

12  Blanco is the Chief Operating Officer.  He is not the Chief

13  Financial Officer.  So he has much more information and we are

14  providing him for both the 30(b)(6) on both UVI and UTC for

15  both of those entities.

16        MS. MEYERS:  And just recently.

17        THE COURT:  Okay.  So I see no reason to grant a

18  protective order with regard to the deposition of those two

19  witnesses.  They may have relevant information unique to their

20  positions within the company.  So I will deny those motions of

21  a protective order.

22        So the only thing we have left, then, is the

23  deposition of Mr. Singh.  And for the reasons I have explained

24  already on the record, it seems to me that the only matter that

25  would survive the *Shelton* analysis would be simply somebody who

1  was present during a meeting.

2          But, then, the relevance of it is very marginal since

3  he would not be able to address anything he discussed or heard

4  during that meeting.

5          MS. MEYERS:  That's fine.  Just provide circumstantial

6  evidence that he was there and heard it.

7          THE COURT:  In that case, can you then put an

8  interrogatory to Mr. Singh rather than have all the parties

9  assemble for a deposition?

10          And if you put that into an interrogatory just asking

11  whether he was present for such a conversation on such and such

12  a date, then that is the only thing I could see would be

13  appropriate in this case.

14          Is there anything else to discuss?

15          MS. MEYERS:  That he was present and then describing

16  what was said.  I mean, it might take a lengthy interrogatory

17  to make sure that it is clear.  That is why a live testimony

18  might be easier.

19          THE COURT:  But then if he answers yes and you put in,

20  well, this was what was said, it will be unclear as to what he

21  heard.

22          All I want the interrogatory to address are the facts

23  of whether he was there during conversation between these

24  people on a particular date.

25          MS. MEYERS:  And heard the conversation.

```
 1          THE COURT:  Beyond that he would be revealing the
 2   conversation or his knowledge of what was discussed.  So beyond
 3   that it is my ruling it would go into attorney/client
 4   privilege.
 5          MS. MEYERS:  Okay.
 6          THE COURT:  That is why I am concerned about the
 7   usefulness of it to you, but if you wanted to do an
 8   interrogatory of simply whether he was there during a
 9   conversation that occurred on a particular date, with
10   particular individuals involved, that narrow factual question
11   can be resolved in an interrogatory.
12          MS. MEYERS:  Well, I think it would be difficult to
13   pinpoint the moment if I don't reveal -- I mean, it is not
14   revealing because it wasn't privileged because our client was
15   present.
16          But if he simply responds to it that he was present,
17   then I don't think there is a way to describe the event without
18   saying what Butch Stewart said to her and him saying that he
19   was present if that is all he is allowed to say.
20          THE COURT:  What Butch Stewart said to her, but not
21   what she said to him.
22          MS. MEYERS:  I mean, she can testify to that.  Yes,
23   correct.
24          THE COURT:  I think it might be the other way around.
25          Mr. Walch, it does not seem to me that what would not
```

```
 1  be privileged is what she said to his client in his presence

 2  and not what is client said --

 3           MR. WALCH:  I am not questioning the privilege there.

 4  I just don't think there is the need here given the reason that

 5  was articulated.

 6           MS. MEYERS:  Okay.  Well --

 7           MR. WALCH:  That is part of the Shelton standard is

 8  the need together with the privilege and I just don't see the

 9  need here.

10           MS. MEYERS:  The need is that --

11           MR. WALCH:  The question --

12           THE COURT:  Understand.

13           MR. WALCH:  -- whether he was present.

14           That's fine to me, but beyond that I think the need

15  problem comes into play here, which she is going to testify

16  about what she is going to testify about.

17           And I can tell you right now we are to the going to

18  have anyone contradict it because we don't, right?  Mr. Singh

19  is now adverse to us and so on.

20           So, you know, the more you get into what he said you

21  want to establish that he is adverse to it.

22           THE COURT:  Or what anyone said it just becomes a

23  problem.

24           MR. WALCH:  Yeah.

25           THE COURT:  So was he there for a conversation between
```

1    the two of them on a particular date would be all that I can

2    determine at this point to be factual and if that is helpful to

3    you and you see that as relevant, you can do so.

4            MR. WALCH:  Your Honor, if I may?

5            You asked earlier if there were additional issues.  We

6    do have a few issues concerning written discovery that we had

7    originally intended to include in the e-mail to Your Honor that

8    was eventually set for the November 4th hearing.

9            THE COURT:  Okay.

10           MR. WALCH:  We did not include in the e-mail because

11   we had at the time another meet and confer that was supposed to

12   take place after the e-mail.  So we agreed to remove it and we

13   said, okay, we will have another meet and confer and then maybe

14   when we reach an actual impasse, then we will go to the Court,

15   right?

16           We did have the meet and confer.  We are at an impasse

17   on certain written discovery issues that we can take up today

18   if Your Honor has time and so wishes or we can defer for

19   another date.

20           THE COURT:  Okay.  Well, let me -- yes, I see Miss

21   Meyers shaking her head maybe there has not been a complete

22   meeting.

23           MS. MEYERS:  The only three things that we were

24   prepared to discuss were the depositions.  And I know that the

25   Unique issue got brought up and we went with it, but we do not

1  believe that anything else is appropriate for the hearing.  Nor

2  are we prepared to argue anything else at this hearing.

3          THE COURT:  Okay.  That's fine.

4          So what you need to do is once you are ready to

5  resolve those things, if we still need that December 4th date,

6  please let me know and we will put it right back on the

7  calendar.

8          I was just trying to extend to get this as moving as

9  efficiently as I can.  But if you still need the December 4th

10  date we will leave it on the calendar.

11          MR. WALCH:  We appreciate it, Your Honor.

12          MS. MEYERS:  Thank you, Your Honor.

13          MR. NORVELL:  And were we appreciate it.

14          Yes, we want to keep that date and we want to thank

15  you for making time for us today given for you to see these

16  issues.  Thank you for making time for us.

17          THE COURT:  Fortunately another hearing cancelled.  So

18  I had a slot for you.

19          MR. NORVELL:  We appreciate that.  Thank you.

20          THE COURT:  We will see you then, on December the 4th.

21          MR. SILVERIO:  Your Honor, one final housekeeping

22  issue.

23          Do you want us to prepare a proposed order of any kind

24  or should we expect the minute entry order?

25          We just want to make sure that Mr. Singh, who is a

1 nonparty, understands his deposition is cancelled.

2       THE COURT:  I do think it is better to have a written

3 order.  So if you would like to prepare an order, Mr. Silverio,

4 and/or Mr. Walch have that go to all parties involved and,

5 then, give me a complete draft.  Then I think that is more

6 complete and that is more organized.

7       MR. SILVERIO:  Thank you, Your Honor.

8       THE COURT:  Okay.

9       MR. WALCH:  Thank you, Your Honor.

10       THE COURT:  When do you think you are going to have

11 that order to me?

12       MR. SILVERIO:  Today, Your Honor.

13       We will circulate -- assuming everyone signs off -- as

14 Limited will have it drafted in an hour, but assuming everyone

15 signs off on if tonight, Your Honor.

16       THE COURT:  Okay.  Perfect.  Thank you so much.

17       MS. MEYERS:  Thank you.

18       MR. NORVELL:  Thank you.

19       THE COURT:  Court is adjourned.

20        (Thereupon, the proceedings concluded.)

21

22

23

24

25

1

2

3                          CERTIFICATE

4

5          I hereby certify that the foregoing transcript is an

6    accurate transcript of the audiotape recorded proceedings in

7    the above-entitled matter.

8

9

10

11
     11/24/24                    Bonnie Joy Lewis,
12                      Registered Professional Reporter
                           CASE LAW REPORTING, INC.
13                        7001 Southwest 13 Street,
                          Pembroke Pines, Florida 33023
14                             954-985-8875

15

16

17

18

19

20

21

22

23

24

25