UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-24073-CIV-ALTONAGA/Reid

HH ADVERTISING, INC.,

     Plaintiff,

v.

UNIQUE VACATIONS, INC., *et al.*,

     Defendants.

_____/

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** came before the Court for a non-jury trial held over several days.[1]  The

Court has carefully considered the testimony of the witnesses, the exhibits admitted in evidence,

the parties' written submissions, and applicable law.  Based on its review of the record and under

Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and

conclusions of law; awarding Plaintiff, HH Advertising, Inc. the sum of $49,500.  The Court will

enter a separate money judgment for Plaintiff as required by Rule 52(a), reserving jurisdiction to

address the parties' requests for costs and attorneys' fees.

---

[1] (*See generally* Feb. 26, 2025 Trial Tr., Vol. 1A ("Feb. 26 AM Tr.") [ECF No. 359]; Feb. 26, 2025 Trial Tr., Vol. 1B ("Feb. 26 PM Tr.") [ECF No. 360]; Feb. 27, 2025 Trial Tr., Vol. 2A ("Feb. 27 AM Tr.") [ECF No. 361]; Feb. 27, 2025 Trial Tr., Vol. 2B ("Feb. 27 PM Tr.") [ECF No. 362]; Mar. 3, 2025 Trial Tr., Vol. 3A ("Mar. 3 AM Tr.") [ECF No. 363]; Feb. 26, 2025 Trial Tr., Vol. 3B ("Mar. 3 PM Tr.") [ECF No. 364]; Mar. 4, 2025 Trial Tr., Vol. 4A ("Mar. 4 AM Tr.") [ECF No. 365]; Mar. 4, 2025 Trial Tr., Vol. 4B ("Mar. 4 PM Tr.") [ECF No. 366]; Mar. 5, 2025 Trial Tr., Vol. 5A ("Mar. 5 AM Tr.") [ECF No. 367]; Mar. 5, 2025 Trial Tr., Vol. 5B ("Mar. 5 PM Tr.") [ECF No. 368]; Mar. 6, 2025 Trial Tr., Vol. 6A ("Mar. 6 AM Tr.") [ECF No. 369]; Mar. 6, 2025 Trial Tr., Vol. 6B ("Mar. 6 PM Tr.") [ECF No. 370]; Mar. 7, 2025 Trial Tr., Vol. 7A ("Mar. 7 AM Tr.") [ECF No. 371]; Mar. 7, 2025 Trial Tr., Vol. 7B ("Mar. 7 PM Tr.") [ECF No. 372]; Mar. 17, 2025 Trial Tr., Vol. 8A ("Mar. 17 AM Tr.") [ECF No. 388]; Mar. 17, 2025 Trial Tr., Vol. 8B ("Mar. 17 PM Tr.") [ECF No. 390]); and Apr. 21, 2025 Trial Tr. ("Apr. 21 Tr.") [ECF No. 497]).

## I.  INTRODUCTION

This action arises from copyright claims by an advertising agency against its former client. Plaintiff, HH Advertising, Inc. is a full-service advertising agency co-founded by Cheryl Hammersmith and Tracey Hunter.  (*See* Hunter Test., Feb. 26 AM Tr 78:7–12).  Defendants, Unique Vacations, Inc., and Unique Travel Corporation (collectively, "the Unique Entities"); and Sandals Resorts International, Ltd., and Sandals Resorts International 2000 Inc. (collectively, "the SRI Entities"), operate the Sandals and Beaches Resorts ("Sandals" and "Beaches").

For over 30 years, Plaintiff provided advertising services to Defendants' resort brands, producing thousands of photographs and videos that appeared on the Sandals and Beaches websites.  The parties' relationship ended in 2023, following the death of the founder of Sandals and Beaches, when Plaintiff demanded Defendants remove photographs and videos it created from Defendants' website.  When Defendants did not do so, Plaintiff initiated this lawsuit.

***The Claims and Defenses.***  Plaintiff seeks declaratory judgments against the Unique Entities and SRI 2000 regarding ownership of certain photos and videos Plaintiff created before June 2021 (the "Works") ("Counts I and III") (*see* Third Am. Compl. ("TAC") [ECF No. 202] ¶¶ 56–63, 77–83); and it asserts seven copyright claims against the Unique Entities and SRI Entities: direct copyright infringement ("Counts II, IV, and VII") (*see id.* ¶¶ 64–76, 84–96, 125–37); contributory copyright infringement, pleaded in the alternative to the direct infringement claims ("Counts V and VIII") (*see id.* ¶¶ 97–108, 138–47); and vicarious copyright infringement, also pleaded in the alternative ("Counts VI and IX") (*see id.* ¶¶ 109–24, 148–68).

In their Answers, Defendants raise shared affirmative defenses, several of which challenge Plaintiff's prima facie case.  (*See* Sandals Resorts International Limited[] and Sandals Resorts International 2000 Inc.'s Answer ("SRI Answer") [ECF No. 203] 50–52; Unique Vacations, Inc.

and Unique Travel Corporation's Answer ("Unique Answer") [ECF No. 204] ¶¶ 169–253). Defendants assert that their use of the Works was within the scope of an implied license; they co-own the Works;[2] the doctrines of unclean hands, waiver, acquiescence, estoppel, and fraud bar Plaintiff's claims; Plaintiff's copyright registrations are invalid due to fraud or because the allegedly infringed works are not copyrightable; the statute of limitations under 17 U.S.C. section 507 bars the claims; and Plaintiff's claims arise outside the United States and thus are not actionable here. (*See* Unique Ans. ¶¶ 169–205, 217–21, 229–36, 241–45, 251–53; SRI Ans. 50–52). Separately, the SRI Entities assert that Plaintiff fails to state a claim for relief (*see* SRI Ans. 50–51); and the Unique Entities argue their use of the Works was fair under 17 U.S.C. section 107; Plaintiff sustained no damages or failed to mitigate damages; and the doctrines of misuse, first sale, and *scenes a faire* bar Plaintiff's claims (*see* Unique Ans. ¶¶ 169–178, 187–216, 223–28, 237–48, 252–53).

## II.  FINDINGS OF FACT

### A.  **The SRI and Unique Entities**

***Defendants' Division of Labor.***  Defendants are four companies that share a common goal: operating the Sandals and Beaches resorts.  In pursuing this goal, Defendants maintain separate corporate structures and perform distinct functions.

Sandals Resorts International 2000 Inc. ("SRI 2000") is the parent of several companies that own and manage the Sandals and Beaches resorts, including Sandals Resorts International, Ltd. ("SRI Limited") — a hotel-management company that provides finance, accounting, training, and legal services to the resorts on behalf of SRI 2000.  (*See* Gebhard Rainer Test., Mar. 7 PM Tr.

---

[2] The SRI Entities argued co-ownership at trial (*see, e.g.*, Apr. 21 Tr. 2421:7–20), but did not plead it as an affirmative defense (*see generally* SRI Ans.).  The Court nonetheless considers their co-ownership arguments, because co-ownership is not an affirmative defense and need not be pleaded to be preserved. *See, e.g.*, *Beard v. Helman*, 722 F. Supp. 3d 521, 538 (M.D. Pa. 2024).

1912:4–16, 1916:25–1917:4, 1919:8–11).[3]  SRI 2000 owns various hotel companies that manage

individual resorts.  (*See* Defs.' Proposed Findings & Concl. ("Defs.' Findings & Concl.") [ECF

No. 476] ¶ 29 (citing Defs.' Ex. List [ECF No. 405], Ex. 6, Services Agreement (2016) [ECF No.

404-6]; other citation omitted)).  It also directs marketing and advertising for Sandals and Beaches,

delegating implementation to Unique Travel Corp. ("UTC").  (*See* Rainer Test., Mar. 7 PM Tr.

1913:1–4; Jeffrey Clarke Test., Mar. 5 PM Tr. 1310:9–16).

As SRI 2000's delegee, UTC is tasked with advertising, marketing, and conducting sales

for Sandals and Beaches.  (*See* Clarke Test., Mar. 5 PM Tr. 1310:9–16; *see also* Rainer Test., Mar.

7 PM Tr. 1920:13–19 (explaining that an agency agreement governs UTC's relationship with SRI

2000; the two entities have distinct ownership structures and no corporate affiliation)).  UTC has

no employees — only a board of directors (*see* Defs.' Findings and Concl. ¶ 12 (citations omitted))

— and subcontracts its responsibilities to Unique Vacations, Inc. ("UVI"), an affiliate of UTC.

(*See* Clarke Test., Mar. 5 PM Tr. 1310:12–16, 1312:2–14).

UVI performs a "plethora of [marketing and advertising] functions[,]" including producing

and placing television and internet advertisements for the resorts.  (Lourdes Blanco Test., Mar. 3

AM Tr. 634:21–23 (alterations added)).  UVI also manages the Sandals and Beaches websites,

sandals.com and beaches.com.  (*See* Clarke Test., Mar. 5 PM Tr. 1312:2–14).

***Defendants' Joint Operation.***  Despite these differences, Defendants operate as a

coordinated unit, with a centralized leadership team making decisions for the group of companies.

Gordon "Butch" Stewart ("Butch Stewart") served as Chairman of all Defendants until his

death in January 2021.  (*See* Rainer Test., Mar. 7 PM Tr. 1905:6–7, 1974:3–5; Hunter Test., Feb.

---

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.  Citations to trial and deposition testimony rely on the pagination and line numbering in the original document.

26 AM Tr. 47:2–4, Feb. 26 PM Tr. 267:23–25).  His son, Adam Stewart, then became Executive

Chairman.  (*See* Conor Lawler Test., Mar. 3 AM Tr. 612:9–17).  Butch and Adam Stewart made

decisions about hiring, firing, resort acquisitions, operations, and marketing for all Defendants.

(*See* Clarke Test., Mar. 5 PM Tr. 1306:6–25).  As UVI's former IT director explained, "decisions

c[a]me from the top, the top being the executive chairman and his group of executives[.]" (Pl.'s

Ex. List [ECF No. 436], Ex. 738, Valentin Flores Dep. Designations ("Flores Dep.") [ECF No.

436-4] 76:12–14 (alterations added)).  Executives in this group included Paul Soutter, CFO "for

the group of companies" in 2017 (*see* Dmitri Singh Test., Mar. 6 PM Tr. 1687:19–24); Gebhard

Rainer, CEO of SRI 2000 and SRI Limited between 2018 and 2024 (*see* Rainer Test., Mar. 7 AM

Tr. 1880:19–24); Dmitri Singh, Defendants' general counsel (*see* Singh Test., Mar. 6 PM Tr.

1695:9–12); and a single "signing director" who created the companies (Flores Dep. 75:25–76:03).

    Consistent with this joint decision-making, Defendants share sensitive information and

financial responsibilities.  (*See, e.g.*, Blanco Test., Mar. 3 AM Tr. 730:21–25; Lawler Test., Mar.

3 AM Tr. 614:3–4 (explaining Defendants freely exchanged financial data); Blanco Test., 645:18–

25 (noting that UVI acted as a "collection agent" for all Defendants)).

    They also appear to view themselves as one collective enterprise.  UVI's Senior Vice

President and Treasurer referred to SRI 2000 and SRI Limited as "Sandals" in her testimony and

admitted to "sort of lumping UVI and UTC together[.]"  (Blanco Test., Mar. 3 AM Tr. 629:18–

630:2, 633:3–5 (alteration added)).  Defense counsel repeatedly referred to "Unique" without

distinguishing between UVI and UTC.  (*See* Feb. 26 AM Tr. 48:22, 52:17, 54:12, 59:25, 61:11).

And UVI's former IT Director asserted that "even though [Defendants] are . . . on paper supposedly

. . . different entities, . . . they're all interrelated."  (Flores Dep. 76:10–12 (alterations added)).[4]

---

[4] Perhaps because of this view, Defendants' officers contradicted each other in testifying about corporate
structures and the role of each Defendant.  (*Compare, e.g.*, Blanco Test., Mar. 3 AM Tr. 633:2 (referring to

Altogether, Defendants overlap to such a degree that any one Defendant's interactions with Plaintiff amount to interactions between all Defendants and Plaintiff.

### B.  **Butch Stewart Retains Plaintiff and Commits to an Exit Payment.**

With that, the Court turns to the beginning of Plaintiff's relationship with Defendants.

***Butch Stewart's Informal Business Practices.***  Butch Stewart, who founded Sandals in the early 1980s, was known as a "marketing genius" with a "passion for advertising[.]"  (Clarke Test., Mar. 5 PM Tr. 1308:2; Hunter Test., Feb. 26 AM Tr. 110:12 (alteration added); *see also* Rainer Test., Mar. 7 PM Tr. 1907:14–21).  Based in Montego Bay, Jamaica, he avoided formality, instead favoring handshake deals and informal conversations.  (*See* Hunter Test., Feb. 26 PM Tr. 280:19; Singh Test., Feb. 27 AM Tr. 428:12–24).  As Singh, Defendants' General Counsel, explained, Butch Stewart would routinely invite business associates to his home, go "have a swim" with them, and "cover everything under the sun."  (Feb. 27 AM Tr. 428:12–17 (alteration added)).  Stewart's business associates called such conversations "meeting[s] in the water."  (Hunter Test., Feb. 26 AM Tr. 101:14 (alteration added)).

Informal, face-to-face meetings were Butch Stewart's primary way of doing business.  (*See, e.g.*, Singh Test., Feb. 27 AM Tr. 424:25–425:4).  He put little in writing and avoided computers; as Singh recalled, "Up to the end, he referred to an email address as an email number."  (*Id.* 425:7–8; *see also id.* 424:19–425:4; *see also* Clarke Test., March 5 PM Tr. 1315:3–6 (observing that Butch Stewart did not write, email, or assemble PowerPoint presentations; "[e]verything he had resided in his head." (alteration added)); Rainer Test., Mar. 7 PM Tr. 1974:13–21).  And he "didn't go back on his word.  Whatever he said, he did."  (Hunter Test., Feb.

---

UVI as UTCs parent company); *with* Clarke Test., Mar. 5 PM Tr. 1312:2–14 (describing the opposite relationship); *see also* Clarke Test., Mar. 5 PM Tr. 1389:18–1390:13 (mistakenly characterizing hundreds of employees of entities other than UVI as UVI employees)).

26 AM Tr. 109:16–17; *see also* Rainer Test., Mar. 7 PM Tr. 1974:22–24; Singh Test., Feb. 27 AM Tr. 429:3–5).[5]

***Plaintiff's Negotiations with Butch Stewart.***   In the early 1990s, Butch Stewart hired Plaintiff — then a fledgling advertising agency focused on television advertisements — to provide advertising services for Sandals.  (*See* Hunter Test., Feb. 26 AM Tr. 82:2–22, 90:15–17).  Over the next several years, HH Advertising co-founders Hunter and Hammersmith produced photographs and videos and purchased advertising slots for Sandals, while also serving other clients; and Hammersmith and Butch Stewart commenced a personal relationship and had several children together.  (*See id.* 97:17–18, 99:24–100:3; Singh Test., Feb. 27 AM Tr. 419:10–12).  In 2000, Butch Stewart persuaded Plaintiff to drop its other clients and exclusively serve Sandals and Beaches.  (*See* Hunter Test., Feb. 26 AM Tr. 98:1–98:11, 107:5–7).  This oral exclusivity agreement was never memorialized.  (*See id.* 109:10–17).

Roughly three years later, Hunter and Hammersmith took part in a meeting in the water with Butch Stewart and negotiated other terms.  (*See* Hunter Test., Feb. 26 PM Tr. 250:25–252:17, 254:10–17).  Plaintiff and Butch Stewart agreed that, in exchange for providing services at discounted rates, Plaintiff would retain ownership rights to the photos and videos it created for Sandals and Beaches; and should the parties' business relationship end, Defendants would purchase the rights to Plaintiff's works for a reasonable sum.  (*See id.*; *see also id.* 101:14–102:7; Feb. 26 PM Tr. 204:17–205:7, 250:2–13, 254:4–6).  Hunter was the only participant in this in-the-water meeting who testified at trial; the parties stipulated not to depose or call Hammersmith (*see*

---

[5] For example, Butch Stewart once verbally agreed to buy a hotel in Turks and Caicos; when the owner asked two years later whether the deal was still on, Stewart simply replied, "I shook your hand and I gave you my word."  (Singh Test., Feb. 27 AM Tr. 429:8–14 (quotation marks omitted)).

*generally* Dec. 19, 2024 Order [ECF No. 262]), and Butch Stewart passed away before this lawsuit began.

Naturally, Defendants challenge Hunter's account.  (*See* Defs.' Findings & Concl. ¶¶ 45–56 (citations omitted)).  They note that neither the meeting nor the resulting agreement was reduced to writing (*see* Hunter Test., Feb. 26 PM Tr. 256:11–16); and several of Defendants' employees testified they were unaware of the meeting or any agreement to pay Plaintiff when the relationship ended (*see* Defs.' Findings & Concl. ¶ 51 (citations omitted)).  Further, in the leadup to a proposed — but ultimately unconsummated — sale of the resort brands and the Unique Entities in 2019, SRI Entities CEO Rainer did not discuss Plaintiff's intellectual-property rights with the potential buyer and had no plan to compensate Plaintiff in connection with the sale.  (*See* Rainer Test., Mar. 7 PM Tr. 1938:18–22; Blanco Test., Mar. 3 PM Tr. 731:10–15).  Nor did Defendants provide documents to the potential buyer describing a payment agreement or Plaintiff's ownership rights — despite uploading Plaintiff's price list to a data room during the due-diligence process.  (*See* Rainer Test., Mar. 7 PM Tr. 1938:1–17).

Still, based on its firsthand observation of Hunter's testimony and demeanor at trial, as well as its review of corroborating evidence, the Court finds her description of the meeting credible. Hunter's testimony was internally consistent and unrebutted by other direct evidence.  The lack of corroboration from Defendants' employees is unsurprising, considering that Butch Stewart never documented the agreement.  And the absence of documentation from Butch Stewart was consistent with his normal business practices.

Other witnesses' testimony also supports Hunter's description of the agreement's terms and shows Defendants were aware of them.  For instance, Defendants' CFO, Paul Soutter, believed Plaintiff owned the rights to the creative works it produced.  (*See* Pl.'s Ex. List [ECF No. 436],

Ex. 737, Paul Soutter Dep. Designations [ECF No. 436-3] 44:3–8). Singh acknowledged knowing that Plaintiff routinely sent cease-and-desist letters relating to photos it created for Defendants. (*See* Feb. 27 AM Tr. 437:23–438:2; *see also* Pl.'s Ex. List [ECF No. 428], Ex. 676, 2010–2014 Cease-and-Desist Letters [ECF No. 428-75] 1–24). Similarly, Adam Stewart testified about a 2010 email in which he indicated he believed Plaintiff owned the rights to photos it had taken. (*See* Feb. 27 PM Tr. 516:15–518:15). Referencing a competitor's use of photos that Plaintiff had produced, Adam Stewart noted the need for a cease-and-desist letter, stating, "the pics belong to our agency" — meaning Plaintiff. (Pl.'s Ex. List [ECF No. 399], Ex. 6, Aug. 12, 2010 Email [ECF No. 399-6] 1).[6]

In fact, Plaintiff routinely enforced its intellectual-property rights throughout the parties' relationship. For instance, after two Florida-based agencies used a photo that Plaintiff had taken for a Beaches brochure, Plaintiff sent a cease-and-desist letter and then settled with the agencies. (*See generally* Pl.'s Ex. List [ECF No. 428], Ex. 650, Feb. 23, 2018 Cease-and-Desist Letter [ECF No. 428-58]; *id.*, Ex. 651, Settlement Agreement [ECF No. 428-59]; *see also* Michael Chesal Test., Mar. 6 AM Tr. 1520:6–1522:14). Plaintiff also registered copyrights for photos and videos in connection with such enforcement actions (*see* Chesal Test., Mar. 6 AM Tr. 1495:18–21; *see also*, *e.g.*, Pl.'s Ex. List [ECF No. 415], Ex. 602-A, Oct. 2001 Registration Form [ECF No. 415-83] 1–4) — a practice Defendants never challenged. Plaintiff's employees' testimony was also consistent with the agreement. For example, Alex Jimenez, Controller for HH Advertising, testified that Plaintiff provided services to Defendants at discounted rates based on an understanding between

---

[6] While Stewart testified that he meant UTC when he referred to "our agency" (Adam Stewart Test., Feb. 27 PM Tr. 516:15–517:7), the Court does not find that portion of his testimony credible, as several days after the email, *Plaintiff* — not UTC — sent the competitor a cease-and-desist letter referencing the same photos (*see* Pl.'s Ex. List, Ex. 676, Aug. 16, 2010 Letter [ECF No. 428-75] 17–21).

Plaintiff and Butch Stewart.  (*See* Mar. 3 PM Tr. 783:23–784:19, 824:1–2; *see also* Hunter Test., Feb. 26 PM Tr. 250:2–11).

In short, the evidence establishes that Plaintiff and Butch Stewart, acting as Chairman of Sandals and the Defendant companies, entered into the oral agreement Hunter described.  This agreement would govern the parties' relationships for decades.

   **C.**   **Plaintiff Creates Photos and Videos for Defendants.**

Between the early 1990s and 2021, Plaintiff created numerous photographs and videos for Defendants.  (*See* Nicola Schmiedt Test., Mar. 4 AM Tr. 954:3–6; Rainer Test., Mar. 7 PM Tr. 1967:18–20).  A typical year involved over 100 photo shoots (*see* Hunter Test., Feb. 26 AM Tr. 132:15–22); each of which produced thousands of "raw," or unfiltered and unedited, photographs (*see* Schmiedt Test., Mar. 4 AM Tr. 933:6–7, Mar. 7 AM. Tr. 1823:21–1824:2; Anthony Cortizas Test., Mar. 7 PM Tr. 2025:22–23).  Most of the photos and videos depicted the resort properties, including hotel rooms, common areas, and natural areas.  (*See* Chesal Test., Mar. 6 AM Tr. 1507:14–17; *see also generally, e.g.*, Pl.'s Ex. List [ECF No. 431], Exs. 733.001–733.160, Website Pages [ECF Nos. 431-4–163]).

While Butch Stewart exercised final approval authority over Plaintiff's work — including its proposals for photo and video shoots and the resulting finished products (*see* Schmiedt Test., Mar. 7 AM Tr. 1855:7–12) — Plaintiff was responsible for the artistic and logistical aspects of production (*see, e.g.*, Hunter Test., Feb. 26 AM Tr. 95:21–23).  Before each shoot, Plaintiff created a "shot list" detailing the photos it planned to take (Schmiedt Test., Mar. 4 AM Tr. 918:15–919:25); hired models, photographers, and videographers; chose wardrobes and props; and decorated rooms (*see id.* 917:4–15; Hunter Test., Feb. 26 AM Tr. 89:16–19; Feb. 26 PM Tr. 167:25–168:8).  Plaintiff's employees remained on set throughout each shoot, instructing the photographers and

10

videographers on the exact angles and specifications Plaintiff required, and adjusting shots as they occurred.  (*See* Hunter Test., Feb. 26 PM Tr. 167:8–168:8; Schmiedt Test., Mar. 4 AM Tr. 921:11–16, 921:19–922:4).

To protect its intellectual-property rights, Plaintiff obtained written assignments of all photo and video rights from each photographer and videographer.  (*See* Hunter Test., Feb. 26 PM Tr. 168:18–25, 179:24–182:3, 185:4–6; Alex Jimenez Test., Mar. 3 PM Tr. 785:16–786:2; Schmiedt Test., Mar. 4 AM Tr. 967:10–968:20; Pl.'s Ex. List [ECF No. 415], Exs. 533–38, Assignment Agreements [ECF Nos. 415-33–44]).  Two representative assignment agreements executed in 1999 and 2002 include a provision referencing, "any copyright protection available for photographic materials generated by Photographer on behalf of [Plaintiff]."  (Pl.'s Ex. List [ECF No. 415], Ex. 533, 1999–2002 Assignment Agreements [ECF Nos. 415-33] 4 (alteration added); *see also* Hunter Test., Feb. 26 PM Tr. 180:2–25–182:3).  Later agreements included a statement that, to the extent allowed by law, all photos, and videos taken at Plaintiff's request would be "works made for hire" under the U.S. Copyright Act or would otherwise be assigned to Plaintiff.  (*E.g.*, Pl.'s Ex. List [ECF No. 415], Ex. 538, 2012 Assignment Agreement [ECF No. 415-38] 1).

Defendants' participation in photo and video shoots was limited.  Butch Stewart was rarely present.  (*See* Hunter Test., Feb. 26 PM Tr. 170:7–13).  When Defendants' other personnel attended, they generally served logistical roles, such as ensuring Plaintiff had access to electricity and keeping resort guests out of the photographs.  (*See id.* 172:24–173:10; Cortizas Test., Mar. 7 PM Tr. 2023:24–2024:3).

Although Anthony Cortizas — UVI's Chief Marketing Officer at the time of trial and its Senior Vice President of Brand Development until 2023 — testified that he, and other personnel

from the Unique or SRI Entities collaborated with Plaintiff in determining shot setups and angles (*see* Mar. 7 PM Tr. 2024:12–13), his account is unpersuasive. Cortizas offered only vague remarks about collaboration, while Hunter and others gave detailed descriptions of Plaintiff's role — and Defendants' absence from the creative process. (*Compare* Hunter Test., Feb. 26 PM Tr. 168:9–17, Mario Kuntz Test., Mar. 17 PM Tr. 2336:21–2337:20, 2338:6–16, *and* Clarke Test., Mar. 5 PM Tr. 1451:23–24 *with* Cortizas Test., Mar. 7 PM Tr. 2024:12–13). Hunter also reported that Cortizas only began coming to photo shoots in 2021, *after* Plaintiff had produced the Works at issue. (*See* Feb. 26 PM Tr. 170:14–20).[7] The Court concludes that Defendants and their employees did not routinely give Plaintiff direction regarding specific shots, angles, lighting, or equipment.

After each shoot, the hired photographers and videographers sent Plaintiff hard drives containing unedited files. Plaintiff then edited images and footage for presentation to Butch Stewart — work that ranged from color corrections to more involved adjustments, such as removing seaweed from photos of beaches. (*See* Schmiedt Test., Mar. 4 AM Tr. 933:1–934:1; Mar. 7 AM Tr. 1828:3–22; Hunter Test., Feb. 26 AM Tr. 121:14–122:6; Kuntz Test., Mar. 17 PM Tr. 2351:8–21; Pl.'s Ex. List [ECF No. 400], Ex. 82, Feb. 16, 2022 Emails [ECF No. 400-47] 1 (discussing edits to photos made at UVI personnel's behest)). Butch Stewart sometimes required additional edits after Plaintiff presented photos to him. (*See, e.g.*, Hunter Test., Feb. 26 AM Tr. 127:17–20). After receiving approval, Plaintiff sent the raw and processed images to UVI's webmaster, whose team typically engaged in further edits and then added final versions to the resorts' websites. (*See* Kuntz Test., Mar. 17 PM Tr. 2351:1–7, 2354:2–7, 2340:19–2341:24;

---

[7] Cortizas claimed to have attended earlier photo shoots (*see* Mar. 7 PM Tr. 2024 Tr. 12–13),  but because he was originally Plaintiff's employee before UVI hired him (*see* Hunter Test., Feb. 26 PM Tr. 171:24–172:1), any earlier attendance may well have been on Plaintiff's behalf.

Schmiedt Test., Mar. 4 AM Tr. 938:8–938:11).

This process produced photographs and videos that became centerpieces of the Sandals and Beaches brands.  Butch Stewart designated Plaintiff as Defendants' sole external advertising agency, responsible for all website images and video content, as well as duties like television-advertisement purchases.  (*See* Hunter Test., Feb. 26 AM Tr. 93:22–94:7).

**D.   Efforts to Formalize the Parties' Relationship After Butch Stewart's Death**

*Plaintiff Begins Assigning its Interest in New Works.*  Following Butch Stewart's death in January 2021 and Adam Stewart becoming Executive Chairman of the Defendant companies, Hammersmith resigned from HH Advertising.  (*See* Hunter Test., Feb. 27 AM Tr. 369:4–15; Cortizas Test., Mar. 7 PM Tr. 2035:4–10).   In the wake of these changes, Cortizas — then newly promoted to SVP of Brand Development at UVI — attempted to "formalize the relationship between UVI and HH."  (Cortizas Test., Mar. 7 PM Tr. 2036:21–2037:10).   UVI CEO Jeffrey Clarke agreed that Butch Stewart's death warranted a change in the parties' relationship, noting that "[o]ral contracts are never a good place to be, particularly when one of the two parties of the oral contract is no longer alive."  (Clarke Test., Mar. 5 PM Tr. 1335:10–21 (alteration added)).

To that end, beginning in June 2021, Cortizas asked Plaintiff to execute an assignment agreement before each shoot, transferring ownership of the resulting works to UTC.  (*See* Hunter Test., Feb. 26 PM Tr. 179:3–18; Cortizas Test., Mar. 7 PM Tr. 2037:12–2039:9; Defs.' Index of Exs. [ECF No. 409], Ex. 102, Feb. 2022 Emails [ECF No. 409-48] 12).   Hunter saw these assignments as changing, not merely formalizing, the parties' ownership arrangement, given Plaintiff's in-the-water agreement with Butch Stewart.  (*See* Hunter Test., Feb. 26 PM Tr. 175:11–25).  But she believed Plaintiff had to execute the assignments if it wished to continue working for Defendants.  (*See id.* 179:5–18).  And Hunter wanted the relationship to continue; in January, she

had advised Adam Stewart that Plaintiff was "behind [him] 100%" as he took over his father's responsibilities.  (Defs.' Index of Exs. [ECF No. 425], Ex. 149, Jan. 22, 2021 Email [ECF No. 425-15] 2 (alteration added)).

**Attempts to Negotiate a Written Contract.**  In November 2021, Clarke, Cortizas, and Adam Stewart met Hunter for lunch to "catch[]up" and further formalize the parties' relationship.  (Adam Stewart Test., Feb. 27 PM Tr. 520:17 (alteration added); *see also* Defs.' Index of Exs. [ECF No. 405], Ex. 73, Nov. 11, 2021 Calendar Entry [ECF No. 425-15] 2).  While the parties dispute much of what occurred at the meeting,[8] each side acknowledges that Hunter agreed to sign a contract formalizing the relationship.  (Hunter Test., Feb. 26 PM Tr. 214:16–215:2; *see also* Defs.' Findings & Concl. ¶ 127).

The parties spent close to three years attempting to negotiate such an agreement.  While these negotiations proved unsuccessful, Defendants argue they show Plaintiff had no agreement with Butch Stewart about exclusive ownership rights or a buyout upon termination.  (*See* Defs.' Findings & Concl. ¶¶ 145–47; *see also id.* 47, 54).  To assess that assertion, the Court examines the timeline.

---

[8] The parties dispute whether they discussed ownership rights — and, if so, what was said.  The testimony about this discussion is vague and contradictory.

Hunter testified she did not raise ownership at the lunch meeting because she believed Adam Stewart shared her understanding that Plaintiff owned the rights to the pre-June 2021 content.  (*See* Feb. 26 PM Tr. 300:18–301:15).  But earlier in the trial, she asserted that she had discussed ownership at the lunch meeting, telling Clarke, Cortizas, and Stewart that Defendants would own "all the rights" once they "paid in full for everything[.]"  (*Id.* 216:2–13).  According to Clarke, Hunter advised Stewart that "going forward, you will continue to own all the creative that you currently had" — which Clarke interpreted to mean the rights to pre-June 2021 content.  (Mar. 5 PM Tr. 1341:2–4).  Yet Clarke also recalled Hunter stating, "All of the assets [are] owned by *us*." (*Id.* 1341:1–2 (alteration and emphasis added)).  Stewart, for his part, simply noted that Hunter said, "Unique owns the copyright" (Feb. 27 PM Tr. 520:2) — without explaining whether Hunter was referring to pre- or post-June 2021 rights (*see generally id.*).

Given these contradictions and imprecisions, the Court does not credit either side's account.

First, on December 22, 2021, Clarke emailed Hunter, asking her to review a draft "Advertising Agency Agreement." (Defs.' Index of Exs. [ECF No. 425], Ex. 148, Dec. 22, 2021 Email ("Dec. 2021 Draft") [ECF No. 425-14] 4; *see also generally id.*; Clarke Test., Mar. 5 PM Tr. 1342:3–25). Layered into the draft agreement was a provision purporting to assign to UTC all rights to past and future creative work produced by Plaintiff without requiring UTC to pay additional consideration for past works:

### 11.    Ownership

All advertising materials, advertisements, content, [and] photographs, . . . created by or for [Plaintiff] . . . for use by [UTC], including, without limitation, all such works and deliverables created by or for [Plaintiff] prior to the Effective Date [of the Agreement] or thereafter for [UTC] . . . (collectively, the "Work Product[s]") are and shall constitute and [sic] "works made for hire" as that term is defined in U.S. Copyright Law, 17 U.S.C. [§] 101 *et. seq.* To the extent such Work Product[s] are deemed not to be works made for hire, [Plaintiff] hereby assigns, transfers and conveys [them] to [UTC], without further consideration . . . .

(Dec. 2021 Draft 11 (alterations added)).

Clarke maintains that this provision was intended merely to memorialize the parties' pre-existing ownership arrangement. (Mar. 5 PM Tr. 1420:20–1421:14). He recalls being surprised when, on January 17, 2022, Hunter returned a version of the agreement with redlines from HH Advertising attorney Michael Chesal, stating Plaintiff owned all works it created; deleting the clauses assigning ownership rights to UTC; and providing Defendants only an express license to use the works. (*See id.* 1346:2–1347:21; Defs.' Index of Exs. [ECF No. 425], Ex. 152, Jan. 17, 2022 Email ("Jan. 2022 Draft") [ECF No. 425-18] 11; *see also* Chesal Test., Mar. 6 PM Tr. 1538:3–17). According to Clarke, Hunter assured him during a phone call that the revision "wasn't intentional, that there was clearly a mistake made," and that changing "ownership away from [UTC]" was "not the intent[.]" (Mar. 5 PM Tr. 1347:15–24 (alterations added)).

Several months later, Chesal sent a third draft, reverting the Ownership provision to the original December 2021 language and adding a comment that "[Plaintiff] is amendable [sic] to assigning all rights in the works of authorship upon payment in full therefor[.]" (Defs.' Index of Exs. [ECF No. 425], Ex. 153, May 24, 2022 Email ("May 2022 Draft") [ECF No. 425-19] 10 (alterations added)).[9]

After further negotiations over other provisions (*see* Michael Chesal Test., Mar. 6 AM Tr. 1529:13–24), the Unique Entities' attorney sent Chesal a new draft that added a single line to the Ownership provision — clarifying, but not altering, the substance of the December 2021 and May 2022 Drafts. (*See* Clarke Test., Mar. 5 PM Tr. 1350:19–1351:18; Defs.' Index of Exs. [ECF No. 425], Ex. 154, Jan. 25, 2023 Email ("Jan. 2023 Draft") [ECF No. 425-20] 10). Chesal responded a week later, stating "we . . . look forward to wrapping this up" and attaching a draft that retained the new line and original language, with minor additions. (Defs.' Index of Exs. [ECF No. 425], Ex. 155, Feb. 1, 2023 Email ("Feb. 2023 Draft") [ECF No. 425-21] 2 (alteration added); *see also id.* 11). The Unique Entities' attorney accepted those revisions and confirmed UVI was ready to sign once Plaintiff did. (*See id.*, Ex. 156, Feb. 2, 2023 Email [ECF No. 425-22] 2; Clarke Test., Mar. 5 PM Tr. 1358:19–1359:11).

Clarke and Hunter interpreted this final draft as awarding ownership rights to UVI for all works Plaintiff produced, while requiring payment only for future works. (*See* Clarke Test., Mar. 5 PM Tr. 1358:4–17; Hunter Test., Feb. 26 PM Tr. 219:2–7). But Hunter insisted she did not understand the Ownership term until the close of negotiations. (*See* Feb. 26 PM Tr. 218:9–220:3). She explained Chesal had negotiated without involving her after April 2022 (*see id.*); and Hunter

---

[9] According to a suggestion from Singh, Plaintiff substituted UVI in place of UTC throughout the agreement. (*See* Jan. 2022 Draft 4 (questioning in a comment from Singh whether the agreement should be in UVI's name); May 2022 Draft 1 (implementing the change)).

only realized UVI would be "taking all [of Plaintiff's] rights when Clarke called and told her to "just sign" the agreement — at which point she asked for advice and Chesal explained the term (*id.* 219:3–25 (alteration added)).  In any event, the term was unacceptable to Hunter, and the agreement was never executed.  (*See id.* 219:8–220:3; Chesal Test., Mar. 6 AM Tr. 1529:25–1530:2, 1538:22–24; Clarke Test., Mar. 5 PM Tr. 1421:7–16).

In support of their argument that the negotiations undermine Plaintiff's account of its agreement with Butch Stewart, Defendants contend that neither Plaintiff nor its counsel mentioned the oral agreement or its terms during negotiations.  (*See* Defs.' Findings & Concl. ¶ 145).  They insist that Hunter must have known about the revisions Chesal sent to the Unique Entities' attorney because Chesal's routine practice was to advise clients of proposed revisions to agreements.  (*See* Defs.' Findings & Concl. ¶ 146 (citing Chesal Test., Mar. 6 AM Tr. 1610:23–1611:24)). Therefore, Defendants argue, the negotiations demonstrate that Hunter believed Defendants already owned Plaintiff's works.  (*See id.* ¶¶ 145–47).

The record does not support this conclusion.  Chesal testified that he raised the oral agreement with the Unique Entities' attorney by objecting to transferring ownership rights without payment.  (*See* Mar. 6 AM Tr. 1538:5–21).  And regardless of whether Chesal apprised Hunter of the drafts, those drafts do not reflect any understanding on Hunter's part that UTC or UVI owned copyrights to the Works.  Rather, they indicate Hunter and Chesal were willing to license or sell rights they believed *Plaintiff* owned — as shown by Plaintiff's proposal to replace the ownership-transfer clause with a licensure provision in the January 2022 Draft (*see id.* 11);[10] and Chesal's

---

[10] Clarke's testimony that Hunter called this revision a mistake and represented that changing "ownership away from [UTC]" was "not the intent" of the revision does not change this conclusion.  (Mar. 5 PM Tr. 1347:15–24 (alteration added)).  Even assuming Clarke accurately recalled the three-year-old phone call, Hunter's statements are vague and not inconsistent with Plaintiff's subsequent attempt to transfer ownership of, rather than create a license to use, its intellectual property.

comment in the May 2022 Draft that Plaintiff was amenable to assigning ownership to the Works upon "*payment in full*" (*id.* 10 (emphasis added)).  This interpretation finds further support in Hunter and Chesal's longstanding practice of enforcing Plaintiff's ownership rights through cease-and-desist letters.

### E.  Defendants Terminate their Relationship with Plaintiff.

During the negotiations, UVI began reducing Plaintiff's responsibilities and assigning routine work — such as creating YouTube and other digital advertisements — to other firms.  (*See* Cortizas Test., Mar. 7 PM Tr. 2069:10–2070:12; Hunter Test., Feb. 26 PM Tr. 220:13–18; Clarke Test., Mar. 5 PM Tr. 1413:25–1414:13).  Against this backdrop, the breakdown of the negotiation process led Hunter to believe Defendants were "really just trying to fire us[.]"  (Hunter Test., Feb. 26 PM Tr. 220:23–25 (alteration added)).

***Hunter's Letter to Clarke and Singh.***  On August 3, 2023, Hunter wrote to Clarke and Singh, explaining she was troubled by the Unique Entities' attempt to secure ownership of Plaintiff's copyright interests without payment.  (*See* Pl.'s Ex. List [ECF No. 428], Ex. 669, Aug. 3, 2023 Letter [ECF No. 428-68] 1).  "As you know," Hunter stated, "the copyright interest in virtually all content we have provided to Unique and Sandals over the years is exclusively owned by [Plaintiff]" (*id.* (alteration added), and Plaintiff "will not give up these copyright interests without fair compensation" (*id.*).  Hunter demanded that Clarke and Singh propose a purchase price for Plaintiff's intellectual property by August 17, 2023 — cautioning that if they failed to do so, Plaintiff would assume Defendants were no longer interested in such a purchase.  (*See id.*).

***The Parties' Relationship Ends.***  Upon receiving the letter, Clarke believed a discussion was in order; in his view, Plaintiff had never claimed exclusive ownership of the copyright interests.  (*See* Clarke Test., Mar. 5 PM Tr. 1362:4–9).  A few days later, Clarke spoke with Hunter,

18

advising that Plaintiff should finish in-progress tasks but pause "anything moving forward" pending resolution of ownership of the HH catalogue of works. (*Id.* 1363:2–8). Cortizas reiterated that "all new projects remain on hold[,]" and UVI would not commission further work absent a clear understanding of ownership. (Pl.'s Ex. List [ECF No. 401], Ex. 128, Sept. 7, 2023 Email [ECF No. 401-27] 1 (alteration added); *see also* Cortizas Test., Mar. 7 PM Tr. 2096:16–2097:5).

Defendants did not reply by August 17, 2023 — or any later date — to propose a purchase price for Plaintiff's intellectual property. (*See* Pl.'s Ex. List [ECF No. 428], Ex. 666, Sept. 22, 2023 Letter [ECF No. 428-65] 2; *c.f.* Hunter Test., Feb. 26 PM Tr. 297:6–9 (suggesting Hunter believed Defendants' failure to comply constituted infringement)). And while Clarke, Cortizas, and Rainer testified they hoped to resolve the ownership dispute and continue working with Plaintiff (*see* Clarke Test., Mar. 5 PM Tr. 1363:8–10; Cortizas Test., Mar. 17 AM Tr. 2044:23– 2045:2; Rainer Test., Mar. 7 PM Tr. 1953:3–6), Hunter — convinced Defendants intended to end the relationship — interpreted the pause as UVI "firing" Plaintiff; no new work meant no income (Hunter Test., Feb. 26 PM Tr. 233:22–234:2).

The Court agrees with Hunter. By August 17, 2023, the relationship had concluded.[11]

***Plaintiff's September 2023 Letters to Defendants.*** Acting on that understanding, Plaintiff's counsel sent two letters to Clarke and Singh in September 2023. (*See generally* Pl.'s Ex. List [ECF No. 428], Ex. 667, Sept. 20, 2023 Letter [ECF No. 428-66]; Sept. 22, 2023 Letter). In the first, Plaintiff's counsel stated that "UVI, UTC, and Sandals recently terminated the

---

[11] While Plaintiff continued to work for Defendants through the end of 2023 (*see, e.g.*, Cortizas Test., Mar. 17 AM Tr. 2144:18–19), that work was in the interest of winding down the terminated relationship. As Plaintiff notes, a contractual non-circumvention agreement between it and another media agency impeded Defendants' ability to replace Plaintiff's media-buying services in 2023. (*See* Pl.'s Findings & Concl. 23– 29; Pl.'s Ex. List [ECF No. 401], Ex. 137, Nov. 10, 2023 Email [ECF No. 401-36] 1). Hunter acknowledged that stopping work immediately would have "hurt the brand[,]" and she wished to avoid such damage to honor Plaintiff's previous relationship with Butch Stewart. (Feb. 26 PM Tr. 235:17–22 (alteration added)).

relationship with HH Advertising"; and explained that Plaintiff was willing to complete media and television advertising purchases for the fourth quarter of 2023 "to allow for the smooth transition of advertising services" to a new firm — but only if Defendants paid $7,493,890 for the purchases in advance. (Sept. 20, 2023 Letter 1–2). Plaintiff's counsel also demanded immediate payment of outstanding invoices totaling $12,148,925.37 (*see id.* 2); and warned Defendants they were "no longer permitted to use any of HH Advertising's Content[,]" as further explained in a forthcoming cease-and-desist letter (*id.* 1–3 (alteration added)).

The cease-and-desist letter, sent on September 22, 2023, justified Plaintiff's demand by explaining that Defendants had terminated the relationship on August 15, 2023 and failed to propose a purchase price by August 17, 2023. (*See* Sept. 22, 2023 Letter 1–2). Neither letter identified specific works that Plaintiff believed it owned; instead, the letters referenced *all* media Plaintiff had created for Defendants over the course of the decades-long relationship — including 95 percent of the photographs on sandals.com. (*See* Rainer Test., Mar. 7 PM Tr. 1956:3–7).

Clarke resisted Plaintiff's written payment demands, which included estimated sums for television ads that had not yet aired and deviated from the parties' longstanding practice that payment was due 60 days after each invoice was finalized. (*See* Clarke Test., Mar. 5 PM Tr. 1368:23–1370:9; Blanco Test., Mar. 3 PM Tr. 724:6–728:20). Even so, UVI made a strategic concession, agreeing to advance payment for television ads to avoid disruption to its business. (*See* Clarke Test., Mar. 5 PM Tr. 1370:10–22). But it did not immediately pay the $12,148,925.37 Plaintiff demanded. (*See* Blanco Test., Mar. 3 AM Tr. 657:19–25). Nor did it initially comply with Plaintiff's sweeping cease-and-desist demands, which would have required UVI to "go dark" in promoting Sandals and Beaches online and on television — a "devastating" outcome. (Rainer Test., Mar. 7 PM Tr. 1995:11–20; *see also* Cortizas Test., Mar. 7 PM Tr. 2050:12–24).

### F.  Litigation Commences, and Plaintiff Registers Copyrights.

Instead, counsel for the Unique Entities and SRI 2000 responded to the September 20 and 22 letters by asserting defenses Defendants would later present in this case — that the parties "always understood and intended" that SRI 2000 owned all works Plaintiff created for Defendants; SRI 2000 was, at minimum, a co-author and co-owner of those materials; and Plaintiff had granted SRI 2000 and the Unique Entities an irrevocable license to use the works.  (*See generally* Pl.'s Ex. List [ECF No. 428], Ex. 664, Sept. 27, 2023 Letter [ECF No. 428-63]).  Defendants contended these arguments justified rejecting the cease-and-desist demand.  (*See id.* 3).

*Defendants Gradually Remove Photos.*  At the same time, recognizing the risks of litigation, UVI and UTC began creating a list of the photos and videos on sandals.com.  (*See* Clarke Test., Mar. 5 PM Tr. 1403:18–1405:11, 1412:8–23).  They also began removing these works "over a period of time" — creating replacement images by working with another agency and replacing each work only when a substitute was ready to avoid a "blank space[.]"  (Rainer Test., Mar. 7 PM Tr. 1956:13–22 (alteration added)).  Cortizas maintained that UVI regularly updates the Sandals website and would have replaced the photos and videos at some point even absent litigation.  (Mar. 7 PM Tr. 2084:11–2085:18).  Still, he acknowledged the escalating legal tension and described the phased approach as a "pragmatic" choice.  (*Id.*).

*Plaintiff Files Suit and Identifies Allegedly Infringing Works.*  That gradual process was unacceptable to Plaintiff.  From her August 3, 2023 letter onward, Hunter believed Defendants' use of Plaintiff's photos and videos constituted infringement.  (*See* Hunter Test., Feb. 26 PM Tr. 297:6–9).  Anticipating litigation, Plaintiff began registering copyrights for images on the sandals.com website, as further explained below.  (*See* Chesal Test., Mar. 6 AM Tr. 1573:2–13).

On October 24, 2023, Plaintiff initiated this lawsuit, seeking to enjoin the Unique Entities and SRI Limited from further use of *all* "creative works" Plaintiff had produced between 1992 and mid-2021, when it started assigning ownership of new works to Defendants.  (Compl. [ECF No. 1] ¶ 13*; see id.* ¶ 19; *see also id.* 8).  Plaintiff filed an Amended Complaint [ECF No. 121] on March 14, 2024, adding copyright-infringement claims; and a Second Amended Complaint ("SAC") [ECF No. 176] on June 21, 2024, adding SRI 2000 as a Defendant.  Finally, Plaintiff filed the operative TAC on August 15, 2024, slightly narrowing its infringement allegations to encompass 1,874 creative works contained in 103 copyright registrations.  (*See generally id.*, Ex. A, "Pre-2021 Projects" [ECF No. 202-1]; *id.*, Ex. B, "Commercials" [ECF No. 202-1]).

Plaintiff continued narrowing the number of works it claimed Defendants infringed — and its theory of where infringement was occurring — through the beginning of trial.  (*See* Mar. 4 PM Tr. 1024:11–1025:4).  By the close of trial, Plaintiff claimed Defendants infringed 645 photos and videos (the "Works") and limited its allegations to Defendants' use of the Works on sandals.com. (*See generally* Pl.'s Ex. List [ECF No. 436], Ex. 734, Index of Composite Copyright Notebook ("Copyright List") [ECF No. 436-1]).

***Plaintiff's Copyright Registrations.***  While Plaintiff registered some copyrights in the early 2000s in connection with sending cease-and-desist letters (*see* Chesal Test., Mar. 6 AM Tr. 1495:18–21), it did not begin registering the Works at issue until Hunter sent her August 3, 2023 letter (*see id.* 1573:2–13).

Plaintiff's registration process involved compiling documentation about each Work it planned to register — including the location and date of creation; the name of the photographer or videographer; a copy of the relevant assignment agreement; and a digital "deposit copy" of the photo or video bearing the original file name assigned by the creator — and forwarding it to Chesal.

CASE NO. 23-24073-CIV-ALTONAGA/Reid

(*See* Jimenez Test., Mar. 3 PM Tr. 785:9–787:8; Schmiedt Test., Mar. 7 AM Tr. 1863:21–1864:8).

Chesal reviewed the documentation, applied for registrations, and certified the information he

submitted in each application was accurate.  (*See* Chesal Test., Mar. 6 AM Tr. 1510:21–1512:3).

By the time Plaintiff sent the September 2023 cease-and-desist letters, the U.S. Copyright

Office had approved nine registrations covering 33 Works.  (*See id.* 1573:20–25, 1574:13–23).

Eight were for single videos, while one was for a set of photos, 25 of which remain at issue:

**Works Registered on or Before 9/20/2023**

| Registration Number and Title of Work | Deposit Copy File Name | Date of Publication | Effective Registration Date |
|---|---|---|---|
| VA0002360875; Best of Barbados Brochure Pictures 2018 | SBD_MainPool_01_150402_082.jpg | 11/01/2018 | 8/31/2023 |
| | SBR_MAIN_POOL_PROXIMITY_014.jpg | | |
| | SBR_CAT_BKSKY_RM_7321_BALCONY_042.jpg | | |
| | SBR_LoversLane_0014 NO Colorized.jpg | | |
| | SMB_24_GYM_24213-1.jpg | | |
| | SBD_Schooners_Food_150402_008.jpg | | |
| | SBD_Proximity_150405_143.jpg | | |
| | SBD_Room1409_OBT_02_150408_027.JPG | | |
| | SBD-S1B_Rm4101_009.JPG | | |
| | SBD_Butchs_150405_046.JPG | | |
| | SBR_LOVERS_LANE_BOWLING_ALLEY_095.jpg | | |
| | 12504_26_Loungers_Beach.JPG | | |
| | SBR_CAT_RPP_RM_10_OUT_TO_IN_025.jpg | | |
| | SBR_Butchs_0069-1.jpg | | |
| | SBR_MainPoolSunrise_728-2.JPG | | |
| | SBR_SouthSeaPoolCabana_0115.jpg | | |
| | SBR_Magic_Rooftop_Pool_1161.JPG | | |
| | SBR_LA_PARISIENNE_DINING_MAGIC_058.jpg | | |
| | SBR_AmericanTavern_1389.JPG | | |
| | SBR_CAT_B1PP_RM_7120_POOL_TO_BEACH_030.jpg | | |
| | SBR_RPP_Rm10_0488.jpg | | |
| | SBR_SKY_BAR_036.JPG | | |
| | SBR_BUTLER_LOUNGE_020-2.JPG | | |
| | SBR_CHI_ASIAN_FUSION_096.jpg | | |
| | SBR_CAT_SM1B_RM_8115_LIVING_AREA_007.jpg | | |
| PA0002431264; Sandals Montego Bay SMB Hero 2022 | SAN-43523_Sandals_Montego_Bay_SMB_HERO_2022_1920x1080_20220718 (00184281xBACC3).MP4 | 10/18/22 | 9/19/23 |
| PA0002437031; Sandals Regency | SAN-43526_Sandals_Regency_La_Toc_SLU_HERO_2022_1920x1080_20220725 (00184283xBACC3).MP4 | 10/18/22 | 9/20/23 |

CASE NO. 23-24073-CIV-ALTONAGA/Reid

| La Toc SLU Hero 2022 | | | |
|---|---|---|---|
| PA0002437032; Sandals Grande St Lucian SGL HERO 2022 | Sandals Grande St Lucian SGL HERO 2022 VIDEO | 10/18/22 | 9/20/23 |
| PA0002437033; Sandals Halcyon Beach SHB HERO 2022 | AN-43528 Sandals Halcyon Beach SHB HERO 2022_1920x1080_20220809 (00184285xBACC3).MP4 | 10/18/22 | 9/20/23 |
| PA0002437049; Sandals Grande Antigua SAT HERO 2022 | SAN-43530 Sandals Grande Antigua SAT HERO 2022_1920x1080_20220802 (00184287xBACC3).MP4 | 10/18/22 | 9/20/23 |
| PA0002437050; Sandals Negril SNG HERO 2022 | SAN-43521 Sandals Negril SNG HERO 2022_1920x1080_20220715 (00184279xBACC3).MP4 | 10/18/22 | 9/20/23 |
| PA0002437052; Sandals Royal Caribbean SRC HERO 2022 | SAN-43522 Sandals Royal Caribbean SRC HERO 2022_1920x1080_20220803 (00184280xBACC3).MP4 | 10/18/22 | 9/20/23 |
| PA0002437426; Sandals South Coast SWH HERO 2022 | Sandals South Coast SWH HERO 2022 | 10/18/22 | 9/20/23 |

(*See* Copyright Index 1–2, 19-20; Defs.' Findings & Concl, Ex. A, At-Issue Works [ECF No. 476-1] 1–2, 37–38 (listing registration dates); Pl.'s Ex. List [ECF No. 415], Ex. 602-B, Certificates of Registration [ECF No. 415-84] 13, 65, 73, 81, 85, 89, 101, 109–12; Pl.'s Ex. List [ECF No. 431], Composite Ex. 732 (1-300), Deposit Copies ("Deposit Copies Pt. 1") [ECF No. 431-1] 1–25 (containing file names, images, and titles submitted to the Copyright Office); *id.*, Composite Ex. 732 (451-655), Deposit Copies ("Deposit Copies Pt. 3") [ECF No. 431-3] 198–205 (same)).

Chesal continued registering Works for Plaintiff over the next several months, eventually obtaining registrations for all 645 Works at issue. (*See generally* Copyright List; Certificates of Registration).

### G.  **Evidence of Infringement**

***Plaintiff's March 2024 Website Capture.***   Shortly before amending its Complaint to include infringement claims, Plaintiff directed its Vice President of Production, Nicola Schmiedt, to "capture" the sandals.com website.  (Schmiedt Test., Mar. 4 AM Tr. 913:8, 957:24–25; *see also id.* 959:4–8).   Schmiedt and his team saved PDFs of all pages that depicted resorts.  (*See id.* 958:15–959:25).   They marked each allegedly infringing photo and video with a green dot (*see id.* 960:7–19); and added a white label bearing the registration number for images registered with the Copyright Office (*see id.* 961:6–19; *see also generally* Pl.'s Ex. List [ECF No. 401], Exs. 161–200, Labeled Website Pages [ECF Nos. 401-59–98]; Pl.'s Ex. List [ECF No. 403], Exs. 201–350, Labeled Website Pages [ECF Nos. 403-1–149]; Pl.'s Ex. List [ECF No. 408], Exs. 351–500, Labeled Website Pages [ECF Nos. 408-1–149]; Pl.'s Ex. List [ECF No. 415], Exs. 501–10, Labeled Website Pages [ECF Nos. 415-1–10]).

In total, Schmiedt's team identified 644 Works on sandals.com in March 2024.  (*See* Schmiedt Test., Mar. 4 AM Tr. 966:13–22; *see also* Pl.'s Proposed Findings & Concl. ("Pl.'s Findings & Concl.") [ECF No. 477] 31 ("In March of 2024, there were 644 Works on the Sandals.com website." (citation omitted)).[12]   Based on personal observation, Schmiedt believed those 644 Works were also on the website earlier, in January 2024 (*see id.* 966:23–25) — an observation Defendants did not contradict.  Clarke confirmed that photos and videos produced by Plaintiff remained on sandals.com until February 2025.  (*See* Mar. 5 PM Tr. 1430:2–13).[13]

---

[12] Plaintiff does not explain why it alleges the infringement of 645 Works when it identified only 644 in March 2024.  The Court does not resolve this discrepancy.  As explained below, the Court limits its analysis to only 33 Works, each of which corresponds to an image or video Plaintiff identified in March 2024.

[13] Schmiedt's team repeated the process in August 2024 and concluded that 432 Works remained on sandals.com.  (*See id.* 966:19–22).  Because Plaintiff did not submit documentary evidence of this later capture and both parties focused their analysis on the March 2024 capture, the Court bases its infringement analysis on the March 2024 evidence.

**Website Captures Compared to Deposit Copies.**   While Defendants do not dispute that Plaintiff accurately captured the Sandals website, they insist many of the photos and videos on the website differ in meaningful ways from the original, "raw" versions Plaintiff submitted to the Copyright Office as deposit copies.   (*See, e.g.*, Defs.' Findings & Concl. ¶¶ 213–15).   The Court has thus compared the images and videos present on sandals.com in March 2024 to Plaintiff's copyrighted Works.   Because, as explained below, Plaintiff is not eligible for damages for all Works with effective dates of registration after September 20, 2023, the Court limits its analysis to the 33 Works registered by or before that date.   (*See supra* § 2.F).   Upon review, the Court finds that some of the images and videos on sandals.com are largely identical to allegedly infringed Works, while others are only slightly different.

*i.  Photos*

Most of the photos registered in Registration number VA0002360875 (for "Best of Barbados Brochure Pictures 2018") are virtually identical to photos that appeared on the Sandals website.   For instance, the SBD_MainPool_01_150402_082.jpg image Plaintiff submitted as a deposit copy is the same as an image of a pool that appeared on the Sandals Barbados Resort website page, aside from slightly tighter cropping and slight darkening of the bottom half of the image on the website's version.   (*Compare* Deposit Copies Pt. 1 3 *with* Pl.'s Ex. List [ECF No. 408], Ex. 458, Labeled Website Pages [ECF No. 408-108] 5–6).   An image labeled "CALICO Café" on the Sandals Royal Bahamian page is a cropped version of the SBD_Schooners_Food_150402_008.jpg image, with no other detectable differences.   (*Compare* Pl.'s Ex. List [ECF No. 408], Ex. 450, Labeled Website Pages [ECF No. 408-100] 5–6 *with* Deposit Copies Pt. 1 6).   Likewise, an image of a bathroom vanity and shower listed on a Sandals Barbados page matches the corresponding deposit copy.   (*Compare* Pl.'s Ex. List [ECF No. 401],

CASE NO. 23-24073-CIV-ALTONAGA/Reid

Ex. 177, Labeled Website Pages [ECF No. 401-179] 5 *with* Deposit Copies Pt. 1 5).

Still, several website images differ noticeably from the registered Works they purportedly infringe.  For example, an image of a pool that appeared on a Sandals Barbados Resort page has a digitally altered blue sky and a Sandals logo in the pool — unlike the cloudy sky and unmarked pool present in the SBR_MAIN_POOL_PROXIMITY_ 014.jpg image Plaintiff submitted as a deposit copy.  (*Compare* Pl.'s Ex. List [ECF No. 403], Ex. 306, Labeled Website Pages [ECF No. 403-105] 1 *with* Deposit Copies Pt. 1 20; *see also* Kuntz Test., Mar. 17 AM Tr. 219817–22).  A photo of a private pool overlooking a beach on the website features a sailboat and several small objects on the beach that are absent from the relevant deposit copy.  (*Compare* Pl.'s Ex. List [ECF No. 403], Ex. 310, Labeled Website Pages [ECF No. 403-109] 1 *with* Deposit Copies Pt. 1 11).  And a photo of a patio and infinity pool on the website shows slightly less vegetation at one edge of the patio and a cloudier sky than the registered version.  (*Compare* Pl.'s Ex. List [ECF No. 403], Ex. 302, Labeled Website Pages [ECF No. 403-101] 2 *with* Deposit Copies Pt. 1 12).

Overall, the Sandals website images and deposit copies are similar, mirroring each other's lighting, shading, angles, color palates, timing, and arrangements.  An ordinary observer would certainly conclude the website images copy the overall artistic expression of the 25 photographs registered under VA0002360875.

### ii.  Videos

The eight videos Plaintiff registered by September 20, 2023 are "hero videos" — short videos of about 20 seconds or less that "featured prominently" on the landing page for each Sandals resort, as well as elsewhere on the Sandals site.  (Cortizas Test., Mar. 17 AM Tr. 2185:3–11).  UVI used these videos during the relevant period.  (*See id.* 2185:9–24 (testifying that hero videos created by Plaintiff appeared on the website)).  Nothing suggests that the hero videos on

sandals.com differed from the videos Plaintiff created and copyrighted. Thus, the Court finds that the eight hero videos bearing registration numbers PA0002431264, PA0002437031, PA0002437032, PA0002437033, PA0002437049, PA0002437050, PA0002437052, and PA0002437426 appeared on sandals.com in March 2024 and earlier.

### H.  **Plaintiff's Contributions to Defendants' Revenues**

Finally, the Court addresses how, if at all, Defendants' post-September 20, 2023 use of the Works relates to their revenue — a key issue for damages.

On a general level, Plaintiff establishes that its decades of work helped Defendants grow the Sandals and Beaches brands. Butch Stewart emphasized marketing from the start, and other executives at UVI followed suit. (*See* Clarke Test., Mar. 5 PM Tr. 1326:2–8 ("Of course, commercials are important. We probably run more commercials than any other travel company out there."). UVI IT Director Valentin Flores confirmed that Plaintiff's television ads drove "immense amounts of traffic . . . to [our] website[s.]" (Flores Dep. 50:09–13 (alterations added)). And the Sandals website itself, which featured thousands of Plaintiff's photographs and videos (*c.f.* Cortizas Test. Mar. 7 PM Tr. 2054:2–4 (estimating there were 2,000 photos on the website at the time of trial)), was a significant source of sales for the resorts (*see* Clarke Test., Mar. 5 PM Tr. 1429:9–14).[14]

That said, Plaintiff fails to show what revenues, if any, Defendants earned from using the Works between the September 2023 cease-and-desist demands and the Works' removal from

---

[14] In addition, several concepts that Plaintiff created and photographed resulted in new revenue streams for the resorts. For instance, after Plaintiff produced photos featuring a candlelit beach dinner, the resorts began offering the experience at guests' requests. (*See* Hunter Test., Feb. 26 AM Tr. 92:11–93:8). And following Plaintiff's introduction of beach cabanas in photo shoots, the resorts allowed guests to book the beds at multiple resorts. (*See id.* 93:10–21).

sandals.com.  Plaintiff submits no evidence of SRI Limited's revenue.[15]  And while it provides figures for the Unique Entities and SRI 2000 — and attempts to isolate revenue derived from sandals.com bookings — Plaintiff does not connect those figures to Defendants' use of the Works.

***SRI 2000's Revenues.***  Plaintiff began its calculation of SRI 2000's revenues with a figure that aggregated sales from both the Sandals *and* Beaches websites during the relevant period: $695,890,185.[16]  (*See* Defs.' Ex. List [ECF No. 420], Ex. D127, Income Statement – Web Direct, Sept. 2023–June 2024 [ECF No. 420-11] 4; *id.*, Ex. D127A, Income Statement – Web Direct, July 2023–Jan. 2025 [ECF No. 420-12] 4; *see also* Lawler Test., Mar. 3 AM Tr. 607:2–20).  To estimate the portion of that revenue derived from sandals.com, Plaintiff reduced the total by 32 percent, relying on data showing that in October 2022 — nearly a year before the cease-and-desist demand — Sandals bookings accounted for 68.81 percent of SRI 2000's web-based sales.  (*See* Pl.'s Ex. List [ECF No. 428], Ex. 687H, Oct. 19, 2022 Email [ECF No. 428-76] 14; *see also* Lawler Test., Mar. 3 AM Tr. 585:12–25).  Plaintiff did not introduce evidence of the actual apportionment of sales between the two resort brands after 2022, and SRI Limited CFO Conor Lawler testified that Sandals' share changed between 2022 and 2025.  (*See* Mar. 3 AM Tr. 595:7–17).  Consequently, the Court is uncertain about the revenue SRI 2000 received from sandals.com during the period of alleged infringement.

---

[15] SRI Limited did not earn *any* revenue directly from Sandals bookings during the relevant period; instead, it received expense reimbursements from SRI 2000 on a cost-plus basis.  (*See* Rainer Test., Mar. 7 PM Tr. 1919:12–21; Lawler Test., Mar. 3 AM Tr. 556:20–25, 618:2–13).  Plaintiff did not submit evidence of the amounts of these reimbursements.

[16] Despite Hunter's testimony that infringement began in August 2023, and Defendants' failure to comply with the September 2023 cease-and-desist demands, Plaintiff — perhaps aiming to preserve its eligibility for statutory damages — asserts that infringement began in January 2024 (*see generally* Pl.'s Findings & Concl.), and therefore only provides revenue data from that point onward (*see id.* 86–94).

***The Unique Entities' Revenues.*** Plaintiff's evidence of UTC's revenue is similarly broad. Plaintiff showed that UTC's total revenue between January 2024 and January 2025 was approximately $564,035,684.[17]   (*See* Pl.'s Findings & Concl. 93–94 (citing Pl.'s Ex. List [ECF No. 428], Ex. 705, UTC Statement of Income . . . [ECF No. 428-84])).   Yet UTC earned this revenue by collecting a 6 percent commission on gross sales of vacation packages across *all* resorts operated by the SRI Entities, as well as Beaches resorts; including sales made by telephone, travel agents, and other non-website sources.   (*See* Pl.'s Ex. List [ECF No. 399], Ex. 23, Worldwide Agency Agreement [ECF No. 399-23] 2, 7; *see* Lawler Test., Mar. 3 AM Tr. 550:19–22; Blanco Test., Mar. 3 AM Tr. 630:5–11, 633:6–7).   Therefore, the $564,035,684 figure — the only UTC financial data Plaintiff submits — does not accurately represent UTC's revenue from sales made on sandals.com.

As for UVI, Plaintiff contends its revenue from "net sales" during the relevant period was $66,961,532.82.   (Pl.'s Findings & Concl. 92–93 (citing Pl.'s Ex. List [ECF No. 428], Ex. 704, UVI's P&L Statements Sept. 2023 – Nov. 2024 [ECF No. 428-83])).   This is incorrect.   As UVI Senior Vice President Blanco explained, UVI does not earn any revenue directly from sales; instead, its revenue consists of reimbursements it receives from UTC on a cost-plus basis for the marketing and advertising services it performs.   (*See* Mar. 3 AM Tr. 633:17–22; *see also generally* UVI's P&L Statements Sept. 2023 – Nov. 2024 (characterizing revenue figures as "Total Income")).

***Other Factors Responsible for Sales on Sandals.com.***   Beyond the unresolved question of how much revenue, if any, Defendants earned from sandals.com, the influence of factors other

---

[17] Plaintiff relies on UTC and UVI's average monthly revenues between January 2024 and November 2024 to estimate their December 2024 and January 2025 revenues.   (*See* Pl.'s Findings & Concl. 92, 94).

than the Works in driving Sandals' online sales further obscures any causal connection between the alleged infringement and Defendants' revenues.

According to Cortizas, UVI routinely analyzes the sources of traffic to the sandals.com website.  (*See* Mar. 7 PM Tr. 2051:17–19).  That analysis indicates approximately 25 percent of web traffic comes from customers who visit the site by typing sandals.com into a browser after receiving a recommendation from a travel agent or because of familiarity with the brand.  (*See id.* 2051:20–2052:4).  Another 35 percent or so of traffic consists of people searching for resorts on search engines.  (*See id.* 2052:5–15).  Text-based ads on Google contribute an additional 10 percent of traffic.  (*See id.* 2052:16–23; *see also* Clarke Test. 1326:18–1327:2).  All told, roughly 70 percent of visitors to sandals.com arrive from sources that do not feature photos or videos produced by Plaintiff.  (*See* Cortizas Test., Mar. 7 PM Tr. 2052:24–25).

Cortizas also observed that customers routinely book vacation packages that are not represented by photos or videos, such as when Sandals offers advance bookings of properties under construction — indicating that price, room availability, and other non-visual factors drive bookings.  (*See id.* 2054:15–2055:3).

In sum, Plaintiff does not present data sufficient to draw a reliable conclusion about what Defendants gained from using the Works during the alleged infringement period.

### III.  CONCLUSIONS OF LAW

The Court begins its legal analysis by addressing Defendants' implied-license defense, as its application narrows the scope of the infringement analysis.  It then turns to Plaintiff's infringement claims, alongside Defendants' co-ownership defense.  Finally, it addresses Defendants' remaining defenses and the issue of damages.

A. **Implied License**

*Defendants Had an Implied License to Use the Works.*   Defendants assert that their use of the Works was within the scope of a nonexclusive, irrevocable implied license.  (*See* Unique Ans. ¶¶ 179–86; SRI Ans. 50–51; Defs.' Findings & Concl. 42–56); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 956 (11th Cir. 2009) (explaining that a copyright owner cannot prevail on a claim of copyright infringement while a nonexclusive license is in effect, unless the license holder exceeds its scope (citations omitted)).   According to Plaintiff, Defendants fail to establish an implied license — and if one existed, it terminated when the parties' business relationship ended in January 2024.  (*See* Pl.'s Findings & Concl. 62–66).   As explained, the Court concludes Defendants had an implied license to use the Works — one that terminated on September 20, 2023, the date of Plaintiff's first cease-and-desist demand.

"An implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work."  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) (citation omitted).  Courts look to objective evidence in evaluating intent.  For instance, the delivery of copyrighted material "without warning that its further use would constitute copyright infringement" is indicative of an intent that the recipient copy and distribute the material.  *Wilchombe*, 555 F.3d at 956 (quotation marks and citation omitted).  Because an implied license is an affirmative defense to copyright infringement, Defendants have the burden of establishing one existed and that their use of the Works was within its scope.  *See Latimer*, 601 F.3d at 1235 (citation omitted).

Defendants easily establish these elements.  Plaintiff does not dispute that it created the Works at Defendants' request, delivered them to Defendants, and intended that Defendants would

copy and distribute the Works via the Sandals website.  Certainly, this was the very purpose of the parties' professional relationship.

That said, Plaintiff protests that Defendants do not establish that the parties intended the Works be used "independent of the creator's involvement" — somehow foreclosing Defendants' ability to prove the third element.  (Pl.'s Findings & Concl. 63–64 (emphasis omitted; quoting *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 515 (4th Cir. 2002))).  This argument is unavailing.  Plaintiff does not identify any Eleventh Circuit caselaw imposing such a requirement.  (*See generally id.*).[18]

In any event, Plaintiff did intend independent use.  Schmiedt and Hunter each testified that once Plaintiff passed the Works to UVI's web team, UVI edited them without Plaintiff's involvement or approval and independently selected and uploaded photos and videos to various pages of the Sandals website.  That arrangement persisted for decades, confirming that Plaintiff expected and intended Defendants to use the Works as they saw fit, consistent with an implied license.

***The License terminated on September 20, 2023.***   Plaintiff next argues that even if Defendants had an implied license to use the Works, it was limited to the duration of the parties' business relationship.  (*See* Pl.'s Findings & Concl. 65–67); *Latimer*, 601 F.3d at 1235 (explaining that implied licenses may be limited, and a defendant who exceeds the scope of an implied license commits copyright infringement).

---

[18] Plaintiff merely points the Court to an Eleventh Circuit opinion acknowledging that jurors can properly weigh factors discussed in *Nelson-Salabes, Inc.*   (*See* Pl.'s Findings & Concl. 64 (citing *Armentrout Roebuck Matheny Consulting Grp., P.C. v. Jackson Cnty. Water & Sewerage Auth.*, 260 F. App'x 174 (11th Cir. 2007))).  The requirement that use be independent of the creator's involvement is not one of those factors.  *See Nelson-Salabes, Inc.*, 284 F.3d at 516.

Because implied licenses are analogous to contracts, their scope is generally governed by state-law principles of contract construction.  *See Benfield v. Uk Acquisition Co.*, No. 05-22292-Civ, 2005 WL 8155934, at *3 (S.D. Fla. Dec. 22, 2005) (citing *Kennedy v. Nat'l Juv. Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999)).  Objective evidence of intent is the touchstone of the scope of an implied license.  *See Latimer*, 601 F.3d at 1235–38.  If the parties so intend, a license can be terminable at will after an agreed-upon term or after a certain event occurs.  *See Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1294–95 (11th Cir. 1999).  Further, a licensee's material breach of an implied license entitles the licensor to revoke the license.  *See Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997) (citations omitted); *see also, e.g.*, *Fokiss, Inc. v. TLM Glob., LLC*, No. 24-cv-14096, 2025 WL 353923, at *6 (S.D. Fla. Jan. 31, 2025).

Here, Plaintiff's early-2000s meeting in the water with Butch Stewart defined the scope of Defendants' implied license.  A core term of the parties' resulting agreement was that Defendants would purchase Plaintiff's intellectual-property rights upon the conclusion of their relationship. The implication was clear: if the relationship ended without that purchase, Plaintiff could revoke the license — both because the agreed term had ended and because Defendants had materially breached the agreement.

That exact scenario unfolded in September 2023.  When Plaintiff's counsel sent its September 2023 Letters revoking Defendants' permission to use any of Plaintiff's works, the parties' relationship had ended over a month earlier, by August 17, 2023. As Plaintiff's counsel explained in the September 22, 2023 Letter, Defendants materially breached the agreement by refusing to purchase Plaintiff's works at the end of the relationship.

Defendants nonetheless argue that the license never terminated.  They assert that implied licenses are irrevocable once consideration is exchanged; that a terminable license would be

illusory; and that Plaintiff failed to restrict the scope of the license.  None of these arguments persuades.

### i. Consideration

First, consideration.  Defendants say they gave consideration for the Works by paying Plaintiff's invoices, making the license irrevocable as a matter of law.  (*See* Defs.' Findings & Concl. 45 (citations omitted)).  But Defendants cite no Eleventh Circuit or Florida caselaw — other than dictum from a district court case — supporting the proposition that consideration renders a license irrevocable.  (*See id.* (citing *Vergara Hermosilla v. The Coca-Cola Co.*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010), *aff'd*, 419 F. App'x 917 (11th Cir. 2011))).  They point instead to out-of-circuit cases holding that nonexclusive licenses supported by consideration are contracts and thus *may* be irrevocable under certain circumstances.  (*See id.* (citing *Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003); other citations omitted)).  These cases are inapt.

Under Florida law — the law that applies here, *see Benfield*, 2005 WL 8155934, at *3 (citations omitted) — implied licenses are generally terminable at will with reasonable notice, *c.f. Perri v. Byrd*, 436 So. 2d 359, 361 (Fla. 1st DCA 1983) (discussing contracts); or upon a material breach, *see Jacob Maxwell, Inc.*, 110 F.3d at 753.  So too, with the license Plaintiff granted to Defendants.

### ii. Illusory nature of the license

Next, Defendants argue that if the Court interprets the license as tethered to the relationship's duration, Plaintiff's implied promise to let Defendants use the Works would be unenforceable.  According to Defendants, Plaintiff could have ended the relationship at any moment and for any reason — and thus could have accepted payment for a set of photos and then immediately terminated the relationship and the license, absconding with Defendants' money.

(*See* Defs.' Findings & Concl. 47 (citing *Off. Pavilion S. Fla., Inc. v. ASAL Prods., Inc.*, 849 So. 2d 367, 370 (Fla. 4th DCA 2003; other citation omitted))).

This argument misinterprets the parties' arrangement. Plaintiff believed commercially reasonable notice was required to terminate the relationship. (*See* Hunter Test., Feb. 26 PM Tr. 258:12–14). Even absent that belief, the Court would imply a notice requirement, following the settled rule that courts read reasonable notice terms into oral contracts lacking definite duration to avoid "constructions of contracts that would render promises illusory[.]" *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440 (2015) (alteration added; citation omitted); *see also Perri*, 436 So. 2d at 361 (explaining that commercially reasonable notice is required to terminate an oral contract lacking an express duration provision (citation omitted)).

That reasonable notice requirement qualifies as a legal detriment to Plaintiff sufficient to render the agreement enforceable. *See Wright & Seaton, Inc. v. Prescott*, 420 So. 2d 623, 627 (Fla. 4th DCA 1982) ("Since the courts . . . do not favor arbitrary cancellation clauses, the tendency is to interpret even a slight restriction on the exercise of the right of cancellation as constituting such legal detriment as will satisfy the requirement of sufficient consideration[.]" (alterations added; quoting 1 S. Williston, A Treatise on the Law of Contracts § 105, at 418–19 (3d ed. 1957); other citation omitted)); *Bossert v. Palm Beach Cnty. Comprehensive Cmty. Mental Health Ctr., Inc.*, 404 So. 2d 1138, 1139 (Fla. 4th DCA 1981) (holding that a two-week notice period constituted consideration because the "fact that a contract may, under certain definite circumstances, be terminable at the option of one of the parties does not, as a matter of law, render the contract unenforceable for want of mutuality" (citation omitted)); *Serra v. Saturn of Clearwater, Inc.*, No. 808-cv-856, 2008 WL 5412213, at *2 (M.D. Fla. Dec. 29, 2008) ("It is well settled that a cancellation clause does not render a contract illusory and unenforceable unless it

CASE NO. 23-24073-CIV-ALTONAGA/Reid

allows a party an *unrestricted* right to terminate at his pleasure." (emphasis added; citing *Lauren, Inc. v. Marc & Melfa, Inc.*, 446 So. 2d 1138, 1139 (Fla. 3d DCA 1984); other citation omitted)).

### iii.  Evidence of intent to limit the license's scope

Then there is the question of whether Plaintiff adequately communicated the restrictions. Defendants contend the license must be unlimited in scope because Plaintiff "failed to expressly convey the limitation[s] at the time it created or delivered any of the Works[.]"  (Defs.' Findings & Concl. 48 (alterations added)).  They rely on *Latimer*, where the Eleventh Circuit stated that an implied license "will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered."  601 F.3d at 1235.  Defendants read this language as establishing a bright-line rule: any limitation on an implied license is unenforceable unless communicated to the licensee at the time of delivery.  (*See* Defs.' Findings & Concl. 48–52).  Defendants construe *Latimer* too narrowly.

In *Latimer*, the Eleventh Circuit examined the scope of two implied licenses — one granted by a painter to a motorcycle customization shop and a motorcycle manufacturer, allowing the shop and manufacturer to promote painted motorcycles; and the second granted by a photographer to the manufacturer, allowing the manufacturer to use motorcycle photos.  *See* 601 F.3d at 1236–38. The scope of the first license was in question because the photographer had also promoted the painted motorcycle; and the photographer and manufacturer disputed whether the second license extended to publication of the photos in a press kit.  *See id.*

The court cited *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008), for the principle that a copyright owner must express any intent to restrict a license at the time of delivery.  *See Latimer*, 601 F.3d at 1235.  Yet in considering the scope of the licenses, the Eleventh Circuit did not limit itself to whether express restrictions were communicated at delivery.  Instead,

it looked to objective indicators of intent and whether the licensor made efforts to communicate restrictions in a manner appropriate to the context. *See id.* at 1236–38.

As to the first license, the court concluded that the photographer's promotion fell within the scope of the license because the painter knew the shop and manufacturer "intended to promote the customized motorcycles as widely as possible and did not expressly restrict the scope of the license when he delivered the work." *Id.* at 1236 (alteration added). But as to the second, the court determined further factfinding was necessary to assess whether the manufacturer had exceeded the scope — *despite* the photographer conveying restrictions only via an intermediary and embedding "all rights reserved" in the photos' metadata. *Id.* at 1237–38. The court distinguished *Asset Marketing Systems*, noting that the licensor there — unlike the licensor in *Latimer* — was in direct communication with the licensee and only sought to limit the license *after* delivering works to the licensee. *See id.* at 1238. Thus, *Latimer* rejected a categorical rule requiring licensors to spell out limitations at the exact moment of delivery, instead favoring a more pragmatic inquiry into intent and the nature of the parties' dealings.

As in *Latimer*, where an intermediary made a time-of-delivery requirement impractical, it would make little sense here to require Plaintiff to restate the end-of-relationship limitation on the implied license upon delivery of each of the hundreds of thousands of photos and videos Plaintiff created. And in context of the parties' relationship, Plaintiff certainly communicated its intent to limit the license's scope.

Although Plaintiff delivered materials directly to UVI's website team, its relationship with Defendants revolved around Butch Stewart — who exercised final approval authority over every creative project. Butch Stewart personally hired Plaintiff, negotiated the terms of its engagement, and — importantly — personally agreed to the end-of-relationship payment. As an architect of

the agreement that limited the license, Butch Stewart would have known of its limitations.  Other decisionmakers in the Defendant companies, including Adam Stewart, understood that Plaintiff owned the rights to its works, as shown by their history of relying on Plaintiff to send cease-and-desist letters and enforce rights against third-party infringers.  In short, Plaintiff effectively communicated the temporal restriction before delivering *any* works, and the parties' subsequent conduct confirmed they continued to operate under that original understanding.

### B.  Copyright Infringement; Co-Ownership Defense

Having determined that Defendants' implied license to use the Works terminated on September 20, 2023 — when Plaintiff revoked permission at the end of the relationship and in response to Defendants' material breach — the Court turns to Plaintiff's prima facie case of copyright infringement, along with two defenses relevant to that analysis.

To establish infringement, Plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991) (citation omitted).  The following sections address these elements in relation to the 33 Works registered by September 20, 2023, when Defendants' implied license terminated.

***Plaintiff Owns Valid Copyrights.***  To prove ownership, Plaintiff must show it complied with applicable statutory formalities and the Works are original — or, in other words, authored by Plaintiff.  *See Latimer*, 601 F.3d at 1233 (citation omitted); *see also Feist Publications, Inc.*, 499 U.S. at 348 (explaining that copyright protection extends "only to those components of a work that are original to the author" (citations omitted)); 17 U.S.C. § 201(a) (providing that copyright ownership "vests initially in the author or authors of the work"); *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) (explaining that a valid registration "is a prerequisite for bringing

an action for copyright infringement" (quotation marks and citation omitted)).  Plaintiff establishes both prongs.

First, the Certificates of Registration confirm Plaintiff satisfied the statutory requirements. (*See* Certificates of Registration 65, 73, 81, 85, 89, 101, 109–12).  Because all 33 Works were first published fewer than five years before their respective registration dates, a statutory presumption of validity attaches to the Certificates.  *See Latimer*, 601 F.3d at 1233 (citing 17 U.S.C. § 410(c); other citation omitted); *see also id.* § 411(b) (providing that copyright registration certificates are presumptively valid).  Defendants bear the burden of rebutting that presumption, *see Latimer*, 601 F.3d at 1233 (citation omitted); *Playboy Enters., Inc. v. Starware Publ'g Corp.*, 900 F. Supp. 433, 436 (S.D. Fla. 1995) (citations omitted) — but they offer no argument as to the validity of the relevant registrations.[19]

Plaintiff also establishes that the Works are original.  *See Home Legend, LLC v. Mannington Mills, Inc.*, 784 F.3d 1404, 1409 (11th Cir. 2015) (citing 17 U.S.C. § 102(a); other citation omitted).  While originality "defies exact definition," courts generally agree that it is "a low threshold."  *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 824 (11th

---

[19] Defendants' defense that Plaintiff's Registrations are invalid due to fraud on the Copyright Office is limited to eight Registrations, none of which corresponds to the 33 relevant Works.  (*See* SRI Ans. 50; Unique Ans. ¶¶ 217–22; Defs.' Findings & Concl. 63–67).  In any event, Defendants do not establish that *any* of the Certificates Plaintiff submitted are invalid.

To prove invalidity, Defendants would need to show (1) inaccurate information was included on an application for copyright registration with knowledge that it was inaccurate; *and* (2) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.  *See St. Luke's Cataract & Laser Inst. P.A. v. Sanderson*, 573 F.3d 1186, 1201–02 (11th Cir. 2009) (citing 17 U.S.C. § 411(b); other citations omitted).  Defendants note inaccuracies in the eight Registrations and contend knowledge can be inferred from circumstantial evidence (*see* Def's findings & Concl. 64 (citing *Sanderson*, 573 F.3d at 1202)), but they fail to identify circumstantial evidence supporting such an inference (*see generally id.*).  They simply assert that because Chesal has "extensive experience in intellectual property law" and submitted certain duplicate Registrations, he must have been "willfully blind[.]" (*Id.* 66 (alteration added)).  But a practitioner's experience does not make his mistakes willful, and Defendants offer no explanation for what Plaintiff or Chesal would have gained by neglecting to prevent duplicate filings — or why Chesal's lapses would have been anything other than inadvertent.

Cir. 1982) (citations omitted).  Under "[p]erhaps the most firmly entrenched definition . . . [a]ll that is needed is that the author contributed more than a 'merely trivial' variation, something recognizably '[its] own.'" *Id.* (alterations added; other alteration adopted; citations omitted).

Still, in the context of visual works, mere ideas cannot constitute original, copyrightable contributions, *see M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990) (citing 17 U.S.C. § 102(b)); nor can the reality of the subject matter depicted, *see Leigh v. Warner Bros.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (citation omitted).  Similarly, *scenes a faire* — incidents, characters, or settings that are indispensable or standard in the treatment of a given topic — are not protectible.  *See Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1248 (11th Cir. 1999) (citation omitted).

Yet any contribution that represents an "original *expression*" satisfies the originality requirement.  *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1070 (7th Cir. 1994) (emphasis added; quotation marks and citation omitted).  Such expression can include "posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression," and "other detail-intensive artistic elements[.]"  *Gillespie v. AST Sportswear, Inc.*, No. 97Civ.1911, 2001 WL 180147, at *6 (S.D.N.Y. Feb. 22, 2001) (quotation marks and citations omitted); *see also Brod v. Gen. Pub. Grp., Inc.*, 32 F. App'x 231, 234 (9th Cir. 2002) (explaining that copyrightable expression includes determining the location and timing of photos (citation omitted)); *Leigh*, 212 F.3d at 1215 (citation omitted).

Plaintiff's creative input goes beyond mere ideas or tropes and includes detail-intensive artistic elements.  Among other contributions, Plaintiff determined shooting locations; controlled the composition, lighting, and timing of each image and video; selected and arranged fabrics, artwork, and props; and choreographed the movements of the models who appeared in the hero

videos.  Plaintiff managed every detail of the photo and video shoots, and the Works reflect that exacting oversight: their expressive elements unmistakably bear Plaintiff's imprint.

Undeterred, Defendants contest ownership on the basis that the photographers and videographers hired by Plaintiff are the authors, and thus owners, of the Works.  (*See* Defs.' Findings & Concl. 62–64).  Assuming the photographers and videographers are the authors because such individuals are often authors (*see id.* 62 (citing *Burrow-Giles Lithographic Co. v. Sarony*, 4 S. Ct. 279, 282 (1884)), Defendants assert that Plaintiff did not prove these contractors assigned ownership of the Works to Plaintiff (*see id.* 62–64).  This argument fails to engage with the facts of Plaintiff's use of photographers and videographers.

Because Plaintiff made original contributions to the Works' expressive elements, it is an author.  *See Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 107–08 (2d Cir. 2002) (explaining that an author under the Copyright Act of 1976 is one who made an original contribution to a work).  At most, the hired photographers and videographers would be co-authors — which would not impair Plaintiff's claims against Defendants.  *See Broad. Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1259 (11th Cir. 2014) (explaining that "a copyright infringement claim can be maintained by a co-owner without joining the other co-owners" (citations omitted)).[20]

While that conclusion settles the ownership issue, the assignment agreements provide a second, independent basis for concluding Plaintiff owns the Works.  *See Metro. Reg'l Info. Sys.,*

---

[20] The record does not even support co-authorship.  To be co-authors, each party must have "(1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors."  *Seventh Chakra Films, LLC v. Alesse*, 666 F. Supp. 3d 1250, 1262 (S.D. Fla. 2023) (quotation marks, citations, and footnote call number omitted).  Neither element exists here.  Hunter and Schmiedt's testimony describes the photographers and videographers as merely executing Plaintiff's detail-oriented directions, rather than creating shots that were recognizably their own.

*Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 596 (4th Cir. 2013) (explaining that copyright ownership can be transferred by agreement (citation omitted)); (Pl.'s Findings & Concl. 43–44). Defendants argue that Plaintiff failed to prove valid assignments because the agreements in evidence do not "identify, describe or specify any of the Works"; and Plaintiff did not establish those assignments were signed by the photographers and videographers who created the Works. (Defs.' Findings & Concl. 63). Yet the agreements explicitly apply to *all* works created at Plaintiff's behest. (*See, e.g.*, 1999–2002 Assignment Agreements 4 (assigning to Plaintiff "any copyright protection available" for materials generated on behalf of Plaintiff)). And testimony from Hunter, Jimenez, and Schmiedt establishes that Plaintiff's routine practice was to secure assignment agreements from each photographer and videographer, including those responsible for creating the Works. Consequently, any photographers or videographers who might otherwise have held ownership rights in the Works transferred those rights to Plaintiff through their agreements.[21]

**Defendants Do Not Own the Works.** Moving on, Defendants argue that even if Plaintiff owns the Works, they also hold ownership rights as co-authors — another theory that, if successful, would foreclose Plaintiff's infringement claims. (*See* Defs.' Findings & Concl. 56–60; Unique Ans. ¶¶ 169–78); *Thompkins v. Lil' Joe Recs., Inc.*, 476 F.3d 1294, 1305 n.12 (11th Cir. 2007) (observing that a co-owner of a copyright cannot be liable to another co-owner for infringement (citations omitted)). But Defendants are not co-owners.

Once again, co-authorship requires that each party have (1) made independently

---

[21] Moreover, the post-2012 agreements that contain works-for-hire terms clarify the photographers and videographers are not authors. *See* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the . . . person for whom the work was prepared is considered the author[.]" (alterations added)); § 101 (defining "work made for hire" as a "work specially ordered . . . for use as a contribution to a collective work[] . . . [or] compilation, . . . if the parties expressly agree . . . that the work shall be considered a work made for hire" (alterations added)); *see also S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers*, 756 F.2d 801, 810 (11th Cir. 1985) (discussing the definitions of collective works and compilations).

copyrightable contributions to the work, and (2) fully intended to be co-authors. *See Seventh Chakra Films, LLC*, 666 F. Supp. 3d at 1262 (citations and footnote call number omitted). Several factors are relevant to the intent inquiry, including whether putative co-authors made objective manifestations of a shared intent to be co-authors; and whether the audience appeal of the work turns on both of their contributions and the share of each in its success cannot be appraised. *See id.* (footnote call numbers omitted); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000); *Janky v. Lake Cnty. Conv. & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009). Courts also ask whether both putative authors superintended the work by exercising control. *Aalmuhammed*, 202 F.3d at 1234 (footnote call number omitted). When the work is visual, exercising control typically entails "actually form[ing] the picture by putting the persons in position, and arranging the [setting,]" or acting as an "inventive or master mind who creates, or gives effect to the idea." *Id.* (alterations added; quotation marks and footnote call numbers omitted).

Unlike Plaintiff, Defendants did not make independently copyrightable contributions to the Works. Defendants made no decisions about props, models, lighting, angles, timing, composition, or other artistic details. *See Gillespie*, 2001 WL 180147, at *6 (citations omitted). Instead, their contributions were limited to non-copyrightable ideas, *see M.G.B. Homes, Inc.*, 903 F.2d at 1493 (citation omitted), such as Butch Stewart's idea that photos should generally feature less seaweed and more sand.

Evidence of mutual intent for joint authorship is also lacking. Defendants did not superintend the photo and video shoots; their involvement on the ground was minimal, incidental, and essentially limited to logistical support. While Butch Stewart approved photos and his preferences informed Plaintiff's work (*see* Defs.' Findings & Concl. 57–58), this approval authority is not the control necessary for co-authorship. Instead, it reflects an author-client

44

relationship.  *See M.G.B. Homes, Inc.*, 903 F.2d at 1493 (discussing the relationship between an architect and a client who approved a blueprint).  Defendants point to their independent decisions over edits and how to use the Works post-delivery as evidence of control (*see* Defs.' Findings & Concl. 57–58) — but those decisions came *after* the Works' creation.

Because of Plaintiff's control over the creative process, the "audience appeal of the [Works]" turns primarily on *Plaintiff's* contributions, not Defendants'.  *Aalmuhammed*, 202 F.3d at 1234 (alteration added; citation omitted).  And the parties' actions reflect that dynamic.  The record contains no objective manifestations of intent to be co-authors.  *See id.* (footnote call number omitted).

In sum, both elements of co-authorship are lacking.  While Plaintiff owns the Works, Defendants do not.  The Court therefore proceeds to the second element of copyright infringement.

***Defendants Copied Protected Elements of the Works.***  Plaintiff can establish copying of original constituent elements either by submitting direct proof of copying; or, if direct proof is unavailable, by demonstrating that Defendants had access to the Works and the allegedly infringing material is "substantially similar" to protected elements of the Works.  *Medallion Homes Gulf Coast, Inc. v. Tivoli Homes of Sarasota, Inc.*, 656 F. App'x 450, 452 (11th Cir. 2016) (quotation marks and citation omitted).  Even if Plaintiff submits direct proof of copying, it must prove substantial similarity, because "there is no infringement unless the defendant succeeded to a meaningful degree."  *Leigh*, 212 F.3d at 1214 (citation omitted).

Courts engage in a two-step inquiry to determine whether substantial similarity exists — first asking whether "similarities between the works are substantial from the point of view of [a] lay [observer]" and then "whether those similarities involve copyrightable material."  *Herzog*, 193 F.3d at 1248 (alterations added); *see also Original Appalachian Artworks, Inc.*, 684 F.2d at 829

("Substantial similarity exists where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." (quotation marks, citation, and footnote call number omitted)).

Of the 33 relevant Works, Plaintiff asserts that Defendants made direct, but modified, copies of the 25 photos listed in registration number VA0002360875; and direct copies of the eight "hero" videos listed under various registration numbers. (*See supra* § 2.F). Because access is undisputed, substantial similarity is the only element at issue.[22]

And here, substantial similarity is not in doubt. The Court's factual findings resolve the first step. An ordinary observer would find both the photos and videos to at least be substantially similar, and in many instances identical. Second, those similarities involve copyrightable material, because they encompass original and detail-intensive artistic elements, including lighting, shading, angles and framing, arrangement of props and other decorations, posing of subjects, and timing. *See, e.g.*, *Leigh*, 212 F.3d at 1215 (citation omitted); *Brod*, 32 F. App'x at 234.

Thus, Plaintiff proves its prima facie case of direct copyright infringement as to the 33 Works with effective registration dates of September 20, 2023 or earlier.

### C. **Remaining Defenses**

The Court addresses Defendants' remaining affirmative defenses.[23] None succeeds.

---

[22] Defendants deny directly copying some of the Works, contending that Plaintiff sent them many near-duplicate photos, often taken only seconds apart — making it impossible to determine whether any image on sandals.com derived from a specific registered photo or a similar, unregistered one. (*See* Defs.' Findings & Concl. 70–71). They point to slight shifts in cloud patterns and other moving scenery as evidence of these differences. (*See id.*). Even if Plaintiff cannot prove direct copying, it establishes infringement if it shows access — which is undisputed — and substantial similarity.

[23] The Court's determinations that Plaintiff owns the Works and establishes copyright infringement disposes of several defenses. The SRI Entities' defense that Plaintiff fails to state a claim for relief against them and the Unique Entities' defense of *scenes a faire* both challenge Plaintiff's prima facie case, and therefore require no further analysis. Likewise, the Unique Entities' defense that Plaintiff did not sustain damages is premised on the proposition that the Unique Entities own the Works (*see* Unique Ans. ¶ 253); as discussed, they do not. While the Unique Entities embed an alternative, conclusory allegation under the heading of

***Equitable Defenses: Unclean Hands, Waiver, Acquiescence, Estoppel, Fraud, and Misuse.***  To begin, Defendants' equitable defenses fail for lack of factual support.  Each rests on the same core contentions that Plaintiff wronged Defendants, either by reneging on assurances — that Defendants were co-authors and owners, had an irrevocable license to use the Works, or would own the Works upon the parties' separation — or by registering the Works at the end of the relationship solely out of personal animus.  (*See* Unique Ans. ¶¶ 187–97, 2016–16, 241–245; SRI Ans. 51).  Defendants offered no evidence that Plaintiff made such assurances or had a duty to assign the Works.  Nor did they establish that Plaintiff registered the Works to harm Defendants; by contrast, the record indicates Plaintiff sought to avoid damage to the brands it helped create.  The Court thus finds no misconduct on Plaintiff's part that would support the application of any fairness-based defense.

***Statute of Limitations Under 17 U.S.C. Section 507.***  A lack of factual support is also fatal to Defendants' statute-of-limitations defense.  Under the Copyright Act, a civil infringement claim must be commenced within three years after the claim accrues.  *See id.* § 507(b).  When the "gravamen" of an infringement claim is ownership, the claim "accrues when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his ownership rights[.]"  *Webster v. Dean Guitars*, 955 F.3d 1270, 1276 (11th Cir. 2020) (alteration added; citations omitted).  When ownership is not the gravamen of the claim, the claim accrues each time an infringing act occurs.  *See id.* (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014)).

---

this defense that Plaintiff failed to mitigate damages, nothing in the record suggests Plaintiff knowingly failed to stop copyright infringement, as a failure-to-mitigate defense requires.  *See Hydentra HLP Int. Ltd. v. Constantin Luchian*, No. 1:15-cv-22364, 2015 WL 12658275, at *4 (S.D. Fla. Dec. 4, 2015).  Lastly, the Unique Entities' first-sale defense fails because that defense requires *owning* copies of the Works.  *See Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010).

Here, the limitation period did not run under either formulation. Acts of infringement continued until February 2025. (*See* Clarke Test., Mar. 5 PM Tr. 1430:2–13). And the earliest that Plaintiff could have reasonably learned that Defendants were violating its ownership rights was in September 2023, when Plaintiff revoked the implied license — less than six months before it first leveled infringement claims. (*See generally* SAC).

**Claims Arising Outside the United States.** Defendants' defense that Plaintiff's claims are barred because the alleged infringement occurred abroad is likewise unavailing. (*See* SRI Ans. 50; Unique Ans. ¶ 251). While the Copyright Act cannot be invoked for infringement that occurs wholly outside the United States, it applies when a defendant contributes to infringement from within the United States. *See Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004) (citations omitted). Further, a defendant who "directs infringing performances into the United States from abroad commits a domestic violation of the Copyright Act." *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 916 (D.C. Cir. 2018). Defendants intended to display Plaintiff's Works within the United States through the Sandals website — and the Copyright Act applies as a result.

**Fair Use.** The fair use doctrine asserted by the Unique Entities (*see* Unique Ans. ¶¶ 237–40) is a statutory defense that balances First Amendment concerns with the rights of copyright holders. *See Latimer*, 601 F.3d at 1238. Four factors are relevant: (1) the purpose and character of use, including whether it is commercial or transformative; (2) the nature of the work, including whether it is previously unpublished and highly creative; (3) the amount and substantiality of the portion used; and (4) the use's effect on the potential market for the work. *See* 17 U.S.C. § 107; *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1262 (11th Cir. 2014) (citations omitted). The central question under the fourth factor is whether the use — considering "the damage that might

occur if 'everybody did it'" — would cause substantial economic harm and frustrate the purpose

of copyright law. *Patton*, 769 F.3d at 1276 (emphasis and citation omitted).

The Unique Entities address only the first and fourth factors (*see* Unique Ans. ¶¶ 237–40)[24]

— and three weigh against them. UVI and UTC's use was plainly commercial, and their edits

altered the Works in ways meant to enhance, not fundamentally alter, the overall function of each

Work. Plaintiff's Works were first published by the Unique Entities, which cuts against fair use.

*See Patton*, 769 F.3d at 1268. While the Works may not be "paradigmatic" of highly creative

expression, they are far more creative than the kind of "bare factual compilation" that might

support a fair-use defense. *Id.* (alterations adopted; citations and quotation marks omitted).

As to the third factor, the Unique Entities used entire Works and large portions of others.

The last factor favors fair use because Plaintiff's depictions of Sandals properties likely lack a

ready market. *See Cambridge Univ. Press v. Becker*, 863 F. Supp. 2d 1190, 1290 (N.D. Ga. 2012),

*rev'd on other grounds*, 769 F.3d 1232 (11th Cir. 2014). At bottom, however, UVI and UTC's

use was not the type that implicates First Amendment concerns sufficient to overcome Plaintiff's

copyrights.

Because no defenses apply, Defendants are jointly and severally liable for direct copyright

infringement as to the 33 Works registered on or before September 20, 2023.[25]

---

[24] The Unique Entities did not address fair use in closing arguments or in Defendants' Proposed Findings of Fact and Conclusions of Law. (*See generally id.*; Apr. 21 Tr.).

[25] Given this conclusion, the Court does not analyze Counts IV, V, VIII, or IX of the TAC, which are pleaded in the alternative to the direct infringement claims in Counts II, IV, and VII. (*See generally id.*). Nor does it address Counts I and III for declaratory judgment; resolution of the infringement claims fully addresses the legal rights at issue, and a declaratory judgment would thus serve no practical purpose. *See Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1376 (S.D. Fla. 2019) (noting courts generally refuse to grant declaratory relief when a plaintiff's "issues [are] resolved by another claim" (alteration added; citations omitted)).

### D. **Damages**

All that remains is Plaintiff's request for damages.  Plaintiff seeks actual damages and statutory damages in the alternative.  (*See* Pl.'s Findings & Concl. 67–96); 17 U.S.C. § 504.  The Court concludes that Plaintiff is entitled to statutory damages but not actual damages.

*Disgorgement.*  The Copyright Act allows a prevailing party to recover actual damages, including disgorgement of profits the infringer earned from the infringement.  *See id.* § 504.  To secure disgorgement of profits, a plaintiff must "show a causal relationship between the infringement and profits, and must also present proof of the infringer's gross revenue." *Pronman v. Styles*, 645 F. App'x 870, 873 (11th Cir. 2016) (citations omitted); *see also Ordonez-Dawes v. Turnkey Props., Inc.*, No. 06-60557-Civ, 2008 WL 828124, at *4 (S.D. Fla. Mar. 27, 2008) (concluding that the gross revenues a plaintiff presents "must be causally connected to the infringement" (citation omitted)).  Because the Copyright Act does not provide for disgorgement on a joint-and-several basis, *see* 17 U.S.C. § 504; *Campbell v. Bennett*, 47 F.4th 1362, 1367 (11th Cir. 2022), Plaintiff must meet its causation burden as to each Defendant.

The phrase "gross revenue" in the statute "mean[s] the gross revenue associated with the infringement, as opposed to the infringer's overall gross sales resulting from all streams of revenue." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 n.8 (9th Cir. 2004) (alteration added; quotation marks and citation omitted).  Therefore, a plaintiff must "do more initially than toss up an undifferentiated gross revenue number"; rather, a revenue stream that "bear[s] a legally significant relationship to the infringement" is required.  *Id.* at 711 (alteration added; footnote call number omitted); *see also Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005).  Once a plaintiff provides revenue figures related to the infringement, the burden shifts to the defendant to show

that part or all that revenue is attributable to factors other than the infringing use.  *See* 17 U.S.C. §

504(b); *Bonner*, 404 F.3d at 294.

Plaintiff fails to carry its burden of submitting evidence of revenue related to infringement

for any Defendant.  As discussed, Plaintiff does not even provide generalized gross revenue for

SRI Limited, let alone revenue associated with the infringement.  The numbers it submits for UTC

and UVI lack a meaningful connection to the infringement: the UTC data include Beaches

bookings and sales made over the phone to customers who may never have seen Plaintiff's Works;

and the UVI figures are not tied to sales at all.  While Plaintiff supplies web-based sales figures

for SRI 2000, it does not identify what percent of those sales was made on the Sandals website —

as opposed to the Beaches site, which contained no infringing Works.

More broadly, Cortizas's testimony established that Sandals' sales are attributable to many

factors that have no relation to photos or videos.  Plaintiff presented no testimony, expert or

otherwise, establishing the relationship between the infringement and the revenue numbers it

submitted.  The result is that Plaintiff's submissions are undifferentiated gross revenue numbers,

which are inadequate to support disgorgement.  *See Watson v. K2 Design Grp., Inc.*, No. 15-cv-

61020, 2016 WL 11783284, at \*12 (S.D. Fla. Aug. 9, 2016) (coming to the same conclusion when

a plaintiff "provided simply gross sales figures, connected to [her] claim by speculative

assumptions." (alteration added)); *Ordonez-Dawes v. Turnkey Props., Inc.*, No. 06-60557-Civ,

2008 WL 828124, at \*4 (S.D. Fla. Mar. 27, 2008) (rejecting an argument that because

"[d]efendants used . . . copyrighted works in promoting their home sales that the sales of *any* homes

during the relevant time period are related to the infringement." (alterations added; emphasis in

original)).

***Statutory Damages.***  Plaintiff seeks statutory damages of $150,000 per infringed Work, whereas Defendants suggest $1,000 per Work, if the Court awards any damages.  (*See* Pl.'s Findings & Concl. 77; Defs.' Findings & Concl. 86).  The Copyright Act entitles an infringed-against party to recover between $750 and $30,000 in statutory damages for each eligible infringed work, "as the court considers just."  17 U.S.C. § 504(c)(1).  That amount can increase to as much as $150,000 per work if infringement is "committed willfully[.]"  *Id.* § 504(c)(2) (alteration added).  Liability for statutory damages is joint and several.  *See id.* § 504(c)(1); *Campbell*, 47 F.4th at 1366.

### i. Eligibility

Statutory damages are subject to a timing restriction: they are unavailable for any infringement "commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."  17 U.S.C. § 412(2).  Moreover, "*the first act of infringement* in a series of ongoing infringements of the same kind marks the commencement of one continuing infringement under [section] 412."  *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 701 (9th Cir. 2008) (alteration added; emphasis in original; footnote call number omitted); *see id.* n.4 (noting the Second, Fourth, and Fifth Circuits also take this view); *Whelan Associates, Inc. v. Jaslow Dental Lab'y, Inc.*, 609 F. Supp. 1325, 1331 (E.D.Pa.1985) (same), *aff'd on other grounds*, 797 F.2d 1222 (3d Cir. 1986); *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998) (noting that "[e]very court to consider this question has come to the same conclusion" (alteration added; collecting cases)).

This restriction precludes statutory damages for 612 of the Works, those first published in 2022 or earlier, with effective dates of registration after the infringement start date of September 20, 2023.  (*See generally* At-Issue Works; Certificates of Registration).  Because infringement of

those Works commenced after first publication and before the effective dates of registration — and more than three months elapsed between first publication and registration — the exception applies, leaving "no room for discretion[.]" *Derek Andrew, Inc.*, 528 F.3d at 699 (alteration added). Plaintiff is entitled to statutory damages for the 33 remaining Works, which were each registered on or before September 20, 2023.

  *ii. Calculation*

  In calculating damages, courts consider "(1) the infringers' blameworthiness . . . (2) the expenses saved and the profits reaped by the defendants in connection with the infringement; (3) the revenues lost by the plaintiffs due to the defendants' conduct; and (4) the deterrent value of the damages imposed." *Broad. Music, Inc.*, 772 F.3d at 1261 (alteration added; citations omitted).

  As a threshold matter, Defendants' infringement was not willful. Willfulness under the Copyright Act requires proof of actual knowledge or reckless disregard of infringement. *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1271 (11th Cir. 2015) (citations omitted). Continued use of a work after an accusation of infringement is not willfulness so long as a defendant "believes reasonably, and in good faith, that [it] is not infringing." *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012) (alteration added; citations omitted).

  Continued use is all Plaintiff shows. (*See* Pl.'s Findings & Concl. 72–73). Defendants believed they were not infringing — and reasonably so, given the absence of any written agreement containing essential terms or access to the only other party besides Hunter to the oral contract, Butch Stewart. This good-faith belief defeats willfulness, limits damages to $30,000 per Work, and tilts the first factor in Defendants' favor. *See* 17 U.S.C. § 504(c).

The second factor tips slightly in Plaintiff's favor. Defendants likely saved some expenses by using the infringed Works, as keeping them on the website may have allowed Defendants to delay commissioning replacement photos and videos. And while Plaintiff does not establish the revenues Defendants earned from the infringement, the Court infers for statutory-damages purposes that Defendants profited to *some* extent from their use of the Works after September 2020. After all, the Works were prominently displayed on the Sandals website, including on the main pages of each resort, and Defendants certainly profited from sales made on the website.

In contrast, Plaintiff does not establish that it lost any sales, profits, or licensing fees because of the infringement. Thus, the third factor weighs strongly against an award at the top end of the range. *See Clever Covers, Inc. v. Sw. Fla. Storm Def., LLC*, 554 F. Supp. 2d 1303, 1312–13 (M.D. Fla. 2008) (noting that statutory damages are not meant to provide a windfall recovery, and awarding $15,000 per infringed work rather than the $150,000 plaintiff requested — despite finding willfulness — because the plaintiff "failed to provide any evidence whatsoever of its own lost sales, profit, or licensing fees"); *Breaking Glass Pictures, LLC v. Devora*, No. 2:13-cv-331, 2015 WL 1020343, at *3 (M.D. Fla. Mar. 9, 2015) (awarding $6,000 for willful infringement when a plaintiff similarly failed to show it suffered financial loss).

Even so, Plaintiff contends the need for deterrence warrants a substantial award. (*See* Pl.'s Findings & Concl. 76). To be sure, deterrence is a goal of statutory damages. *See F. W. Woolworth Co. v. Contemp. Arts*, 344 U.S. 228, 233 (1952). But a substantial award is not necessary here to discourage Defendants or others from infringing copyrights. As Defendants note, this is not a case of "brazen infringement" involving the unauthorized copying of a stranger's work. (Defs.' Findings & Concl. 86). Instead, it is anomalous — characterized by the breakdown of decades'-long personal and professional relationships and complicated by an oral agreement made in the

Caribbean by Defendants' deceased founder and an implied license Defendants reasonably believed remained in effect.

Because the first, third, and fourth factors weigh heavily against a large award, while the second factor only slightly favors Plaintiff, the Court finds that Plaintiff is entitled to an award of $1,500 for each of the 33 infringed Works.

## IV.    CONCLUSION

In accordance with the foregoing, final judgment will be entered by separate order for Plaintiff, HH Advertising, Inc. and against Defendants, Unique Vacations, Inc., Unique Travel Corporation, Sandals Resorts International, Ltd., and Sandals Resorts International 2000 Inc.  The Court reserves jurisdiction to address the parties' requests for attorneys' fees, including related issues such as prevailing party status.  No motion for fees or costs may be submitted until the time for filing a notice of appeal has passed; if a party appeals the Final Judgment, no motion for fees or costs may be filed until resolution of the appeal.

**DONE AND ORDERED** in Miami, Florida, this 21st day of July, 2025.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record